**Eddie Lee MILLER, Appellee,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Appellant.**

**No. 94–3264EA.**

United States Court of Appeals, Eighth Circuit.

Submitted April 10, 1995.

Decided Sept. 7, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 27, 1995.*

---

**3.** Indeed, Marlin was eventually convicted of perjury for failing to disclose its existence.

* Judge Fagg would grant the suggestion for rehearing en banc.

Kelly K. Hill, Assistant Attorney General, argued (Pamela Rumpz, Little Rock, AR, on the brief), for appellant.

Ray E. Harstein, Little Rock, AR, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, MURPHY, Circuit Judge, and DAVIS,** District Judge.

RICHARD S. ARNOLD, Chief Judge.

The Director of the Arkansas Prison System challenges the District Court's[1] order granting Eddie Lee Miller's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The District Court set aside both Miller's conviction and his sentence because of errors in the jury-selection process, and set aside Miller's sentence on the additional ground of errors in the penalty phase of the trial. The District Court's opinion is report-ed at 861 F.Supp. 1425 (E.D.Ark.1994). We affirm the judgment.

## I.

Miller was convicted on March 20, 1979, of the murder of W.F. Bolin. Miller is black, and Bolin was white. The venire summoned for Miller's trial consisted of 147 people, 67 of whom were black. However, only 73 veniremen actually showed up at the courthouse on the day of the trial, 31 of whom were black. After excusals by the Trial Court, 48 panel members, 21 of whom were black, remained. During voir dire, several more veniremen were successfully challenged for cause, leaving only 13 black potential jurors. Ten of those veniremen, nine who would have been jurors and one who would have been an alternate, were removed through peremptory strikes by the prosecutor. Miller was tried by a jury made up of nine whites and three blacks.

During the trial, the state contended that Miller went to Bolin's small business intending to rob Bolin. Miller allegedly spent about ten minutes looking over merchandise and filling out a credit application before forcing Bolin into the back room of his business, where Bolin was shot with a .38 caliber pistol.

Jim Hudson, the barber next door, heard the shots and came to investigate. Entering the side door of Bolin's business, Hudson came face-to-face with a black man who was holding Bolin's metal cash box. The man ordered Hudson into the shop, but Hudson thought better of it and backed out of the door. The man then fled the building, placing the gun in his belt or his clothes. Hudson could not identify Miller as the man who met him at the side door.

The jury found Miller guilty of capital felony murder. At the penalty phase of the trial, the assistant prosecutor delivered a zealous closing argument in favor of the death penalty. He stated that Bolin's family members who were in the courtroom wanted

---

** The Hon. Michael J. Davis, United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable George Howard, Jr., United States District Judge for the Eastern and Western Districts of Arkansas.

Miller executed, though none of them had testified to that desire. He asked that the jury consider the cost of keeping Miller, who was twenty-seven years old at the time, in prison for life as opposed to executing him, though no evidence was taken on the subject. Then he commented on Miller's failure to take the stand and ask for mercy in the penalty phase of the trial. Next he referred to Miller as a mad dog, and said "you don't do but one thing with a mad dog. You put him to death...." And, according to counsel, Miller was not only a mad dog, but a mad dog who had a history of escaping from jail. Thus, to sentence Miller to life imprisonment would be "taking a terrific risk."

The jury was instructed to make certain findings regarding the existence or non-existence of aggravating circumstances and mitigating circumstances, and to weigh them against one another. However, the mitigating-circumstances instruction fashioned by the trial court required the jury to find unanimously that a mitigating circumstance existed before it could enter into the equation.

The jury found that four aggravating circumstances existed: Miller had previously committed a violent felony, Miller committed the murder for pecuniary gain, Miller created a great risk of death to a person other than the victim when he killed Bolin, and Miller committed murder in order to avoid or prevent arrest or to effect escape from custody. No mitigating circumstances were found to exist. Miller was sentenced to die in the electric chair. His conviction and sentence were upheld by the Arkansas Supreme Court on both direct and collateral review.

## II.

The District Court set aside Miller's conviction and sentence because the prosecutor used his peremptory strikes to exclude blacks from the jury in violation of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[2] *Swain* established that

prolonged "purposeful or deliberate" exclusion of blacks "as jurors in the administration of justice violates the Equal Protection Clause." *Id.* at 203–04, 85 S.Ct. at 826. In order to establish a prima facie case under *Swain,* a habeas petitioner must show that, over time,

> the prosecutor perverted the peremptory challenge system by using his challenges "to exclude blacks from the jury 'for reasons wholly unrelated to the outcome of the particular case on trial,' or to deny to blacks 'the same right and opportunity to participate in the administration of justice enjoyed by the white population.'"

*Garrett v. Morris,* 815 F.2d 509, 511 (8th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987) (quoting *Batson v. Kentucky,* 476 U.S. 79, 91, 106 S.Ct. 1712, 1720, 90 L.Ed.2d 69 (1986) (quoting *Swain,* 380 U.S. at 224, 85 S.Ct. at 838)). *Swain* does not turn on the prosecutor's reasons for exercising his challenges in a particular case. Instead it created a presumption that the prosecutor is not using his strikes in a racially improper manner, but rather to "obtain a fair and impartial jury." *Ibid.* (citing *Swain,* 380 U.S. at 222, 85 S.Ct. at 837). "That presumption may be overcome by showing that the prosecution has systematically excluded blacks from petit juries over a period of time ...," *ibid.* (citing *Swain,* 380 U.S. at 223–24, 85 S.Ct. at 837–38), or where the prosecutor volunteers a reason for exercising his peremptories, and that reason is a pretext for racial discrimination. *Ibid.*

In challenging the District Court's order upholding Miller's *Swain* claim, the State asserts initially that much of the evidence that Miller relied on in the District Court should have been barred because it was not first presented to the state court.[3] Relying on *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the State asserts that Miller should be limited to the record created in the trial court and the Arkansas Supreme Court. In *Keeney,* the

2. Miller's conviction and sentence became final prior to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which overruled *Swain* in part. The Supreme Court has held that *Batson* may not be applied retroactively on collateral attack. *Allen v. Hardy,* 478 U.S.

255, 259–61, 106 S.Ct. 2878, 2880–82, 92 L.Ed.2d 199 (1986) (per curiam).

3. The State concedes that the *Swain* claim itself is properly before us.

Supreme Court held that "a federal habeas petitioner must fully develop the factual record upon which he relies in his state court proceedings." *Blair v. Armontrout,* 976 F.2d 1130, 1141 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2357, 124 L.Ed.2d 265 (1993) (citing *Keeney,* 504 U.S. at 7–11, 112 S.Ct. at 1719–20). Failure to do so may "only be excused on a showing of cause and prejudice or a fundamental miscarriage of justice." *Blair,* 976 F.2d at 1141–42. Thus, the State would have us bar from consideration all of Miller's statistical evidence regarding jury-selection practices in Crittenden and Mississippi counties, the testimony of Miller's expert witness regarding those practices, and the affidavits and testimony of several practicing attorneys in those counties regarding the use of peremptory challenges to exclude blacks from juries in those counties.

 We need not decide whether *Keeney* could have applied to establish a procedural bar to additional evidence in this case, because the State waived whatever application it might have had. Procedural bars to federal court habeas corpus review, including the one created by *Keeney,* must be raised in a timely manner, or they are waived.[4] *Lawrence v. Armontrout,* 31 F.3d 662, 666 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1124, 130 L.Ed.2d 1087 (1995). When the evidentiary hearing was requested and granted, the State offered no opposition. When a private investigator and an expert were appointed by the Court, at public expense, to develop Miller's *Swain* claim, the State did not oppose their appointment. During the three-day evidentiary hearing in the District Court, which dealt almost exclusively with Miller's *Swain* claim, the State never once raised an objection to the admissibility of this evidence. In fact, all of the evidence the State now challenges was introduced by stipulation, a fact which virtually destroys any later challenge to its consider-

ation. *Cf. United States v. Mezzanatto,* — U.S. —, —, 115 S.Ct. 797, 802, 130 L.Ed.2d 697 (1995) ("evidentiary stipulations are a valuable and integral part of everyday trial practice").

The State did not raise an objection to this evidence until its post-hearing brief. At the oral argument in this Court, the State's counsel stated that one explanation for the objection's coming so late was that the State thought the evidence in the hearing would address a different issue: whether blacks were systematically excluded from venires. However, during the evidentiary hearing, the State's counsel (a different lawyer from the one at oral argument) stated, in one of his objections, that certain evidence was beyond the scope of the hearing because it addressed systematic exclusion of blacks from venire panels, not peremptory challenges. The only issue before the Court, he contended, was "the State's use of peremptories." We therefore reject the explanation that the State did not object because it thought the evidence related to some subject other than peremptory challenges.

This point has not been properly preserved. The State was given the opportunity to refute Miller's evidence with evidence of its own, both at the hearing and later if it so wished, but chose not to. It would be unfair to allow the State, after observing the strength and volume of Miller's evidence, to avoid the consequences of that evidence with such a belated challenge. We hold that the District Court correctly considered all of the evidence that Miller presented.

 The State also argues that Miller failed to establish a *Swain* violation. We disagree. In Miller's trial, the prosecuting attorney used all of his peremptory challenges to strike blacks. True, three of the jury members were black. However, because of the large representation of blacks on the venire, it was inevitable that some blacks would make it to the jury. Furthermore, a

---

4. The State contends that, under *Sochor v. Florida,* 504 U.S. 527, 534 n. **, 112 S.Ct. 2114, 2120 n. **, 119 L.Ed.2d 326 (1992), procedural bars cannot be waived because they are jurisdictional in nature. *Sochor,* however, came to the Supreme Court on direct review of a state-court decision, and the issue was whether an adequate

and independent state ground supported the judgment below. This is indeed a jurisdictional question. This case, however, is a habeas case, and a *Keeney* bar is not an adequate and independent state ground, it is a federal rule created by Supreme Court case law. Thus, *Sochor* does not apply.

"[p]etitioner is not required to show that the prosecutor *always* struck *every* black venireman offered to him ... but the facts must manifestly show an intent on the part of the prosecutor to disenfranchise blacks...." *Willis v. Zant*, 720 F.2d 1212, 1220 (11th Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984) (internal citation omitted). Thus, as a threshold matter, the fact that Miller's jury was not all white does not defeat his claim.

Miller has established that the prosecutor "systematically excluded blacks from petit juries over a period of time," thus defeating the presumption "that the prosecutor [used] the State's challenges to obtain a fair and impartial jury." *Garrett*, 815 F.2d at 511. Crittenden County, Arkansas, where Miller was tried, and Mississippi County, Arkansas, where Bolin was killed, are both in the same judicial district, meaning that the same prosecutors serve both counties. Several practicing attorneys from those counties testified, by affidavit and in the evidentiary hearing, that prosecutors typically used peremptory strikes to exclude blacks from juries during the relevant period of time.

Notably, one of the attorneys who testified was Bill Ross, Miller's trial counsel and a long-time public defender in that area. Ross was so convinced, based on his prior experiences with this prosecutor, that the prosecutor would try to strike all of the black veniremen that he made a pre-trial motion to prevent him from doing so. Ross's contemporary anticipation of the prosecutor's actions seems to us well supported by the record made in the habeas court.

The most convincing testimony came from Dr. Robert Berry, a statistician who assisted in developing Miller's *Swain* claim. Dr. Berry examined the venire rolls from Mississippi and Crittenden counties for 1970 through 1981. His examination revealed a consistent pattern for both counties. For the years 1970 through 1975, blacks were so underrepresented on venires that their exclusion cannot be explained as the result of random selection. On the other hand, beginning in 1976, the representation of blacks increased so dramatically that, by the late 1970's and early 1980's, blacks were actually overrepresented on venires, sometimes to a statistically significant degree.

In conjunction with this analysis, Dr. Berry also examined peremptory-challenge practices for the same period. This analysis reveals another trend. When blacks were underrepresented on venires, prosecutors used few peremptories to exclude blacks. Conversely, when representation of blacks increased, prosecutors began to use more and more challenges to exclude blacks, even to the point, as in this case, that all of the State's peremptories were used to exclude blacks. Dr. Berry describes peremptories in these cases as a "guillotine" that excluded blacks based on "what color is the potential juror's skin."

A comparison of the capital-murder trials of Miller and Clay Anthony Ford, another Arkansas death-row inmate who was tried in Mississippi County during this same time period, serves as a microcosm of the jury-selection practices described by Dr. Berry.[5] In Miller's case, blacks were overrepresented, nearly to a statistically significant extent, on the venire. Conversely, in Ford's case, blacks were vastly underrepresented on the venire. In Miller's case, the State utilized ten peremptories to strike blacks, while using none to strike whites. In Ford's case, the State used only five of its 10 peremptories to strike blacks. Notably, the same lawyer prosecuted both Ford and Miller. The unmistakable conclusion we draw from this evidence is that blacks were "systematically excluded from petit juries" in Crittenden and Mississippi Counties during the relevant period of time by the state's use of peremptory challenges.

The State claims that the data used by Dr. Berry in reaching his conclusions were insufficient and unreliable. What the State failed to do was introduce some type of reliable *evidence* that Dr. Berry's data are flawed. In fact, the State did not introduce any evidence at all. We affirm the District Court's

---

5. Ford was not tried between 1970 and 1975. However, the proposition that Dr. Berry posits still applies. So few blacks were summoned that the prosecutor had to use very few peremptories in order to achieve an all-white jury.

holding that blacks were excluded from Miller's jury on account of their race in violation of the Equal Protection Clause and *Swain*. Miller's conviction and sentence are set aside, and the State of Arkansas is ordered to retry him or release him within such reasonable time as the District Court, on remand, may fix.

### III.

In addition to setting aside Miller's conviction and sentence on the basis of *Swain*, the District Court set aside the sentence because of improper statements made by the assistant prosecutor during the penalty phase of the trial. It is unnecessary for us to discuss these further points. What we have already said is sufficient to affirm the judgment. We nevertheless proceed to discuss the grounds given by the District Court for invalidating the sentence, as distinct from the conviction, for two reasons. First, it is possible that our disposition of the *Swain* claim may be reversed or modified on further review, in which event Miller's attack on his sentence would become relevant. Second, some of the issues concerning the sentencing proceeding may recur in further proceedings in the state courts.

Several of Bolin's family members were present in court during the trial. Referring to the family's desire for the death penalty, the prosecutor stated to the jury that "you know what their presence here is asking you to do. I think you should consider their wishes." None of the family members, however, testified during the penalty phase, nor did any of them at any time testify that he or she wanted Miller put to death.

The prosecutor then referred to the "tremendous burden" that life imprisonment for Miller, who was 27 years old at the time, would "put on the taxpayers." He asked the jury to consider "[t]he cost of food, clothing, shelter, and guards" for Miller over the rest of his life. The clear implication of this statement is that executing Miller would cost less than life imprisonment. However, no evidence was taken on this subject.

Then the prosecutor admonished the jury not to reach a "compromise" that "life without parole is a very serious strong penalty ... [that will] keep him out of society...." The "one little problem with that," he argued, was that the defendant had "escaped [from jail] once." This statement was the first reference in the closing argument to Miller's history of escaping from jail.

As the argument progressed, the prosecutor referred to Miller's failure to take the witness stand during the penalty phase of the trial and ask for mercy. This action, combined with the fact that Miller denied killing Bolin during the guilt phase, proved, he said, that Miller did not deserve mercy. Moreover, these actions demonstrated that Miller was "tough" and that he did not "care" about what he had done. Indeed, according to the prosecutor, in his 20 years of practice involving "a lot of criminals and a lot of people," he had "never seen me one that was [as] tough" as Miller.

As the argument approached its close, Miller was characterized as a "mad dog" who could not be rehabilitated. The prosecutor then told the jury that "[y]ou don't do but one thing with a mad dog. You put him to death, don't you?" Immediately following these statements, the jury was once again reminded that Miller had a history of escaping from jail. That statement led immediately to the prosecutor's telling the jury that they were taking a "terrible risk" if they "sentence[d] him to life imprisonment with him having escaped once already."

At this point, Miller's trial counsel moved for a mistrial, arguing that the prosecutor's statements implied that Miller would escape from jail and exact revenge upon the jury. The prosecutor, on the other hand, said that he would clear up the argument by explaining to the jury that he was referring to a risk to society at large. The trial court merely denied the motion and told the prosecutor to continue. The prosecutor did so by stating that "if this man is loose, if he is free again," all of society is at risk.

The District Court held that the foregoing statements violated Miller's rights in two respects. The comment that referred to Miller's failure to testify violated his Fifth and Fourteenth Amendment rights to protection against adverse comment on Miller's silence

by the prosecutor. Characterizing Miller as a mad dog, an escape artist, and a threat to jurors' safety, and referring to the cost of life imprisonment as opposed to execution violated the Eighth Amendment by minimizing the jury's role and injecting irrelevant factors into the jury's deliberation.

■ At the outset, we note that the District Court incorrectly considered the merits of Miller's Eighth Amendment claim that the prosecutor's statements minimized the jury's role. Misleading prosecutorial comment which negatively impacts "the need for reliable sentencing in capital cases," *Sawyer v. Smith*, 497 U.S. 227, 235, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990), offends the Eighth Amendment. This rule was initially recognized in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which was decided after Miller's sentence and conviction became final. The Supreme Court has held that *Caldwell* may not be applied retroactively on collateral review. *Sawyer*, 497 U.S. at 245, 110 S.Ct. at 2833. Miller is, therefore, barred from asserting this claim.

But Miller also asserts, and the District Court held, that Miller's due-process rights were violated by the prosecutor's statements. This theory, first recognized in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), is founded on the notion that some comments "so infect[ ] the trial with unfairness as to make the resulting [sentence] a denial of due process." *Id.* at 643, 94 S.Ct. at 1871. *Donnelly* was decided well before Miller's case became final, and is, therefore, available to him. See *Sawyer*, 497 U.S. at 243, 110 S.Ct. at 2831–32. This Court's analysis for determining whether a prosecutor's improper closing argument rises to the level of a due-process violation is well settled. We

(1) measure the type of prejudice that arose from the argument; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been dif-

ferent, taking into account all of the aggravating and mitigating circumstances.

*Antwine v. Delo*, 54 F.3d 1357, 1363 (8th Cir.1995) (citing *Newlon v. Armontrout*, 885 F.2d 1328, 1337 n. 10 (8th Cir.1989)).

■ The State argues that we are procedurally barred from reviewing the prosecutor's comments in their entirety. It asserts that Miller's trial counsel objected only to that portion of the argument that portrayed Miller as an "escapist" who presented a risk to the safety of the jurors. The rest of the argument, accordingly, should be beyond our review because it was never presented to the state courts for decision. See *Buckley v. Lockhart*, 892 F.2d 715 (8th Cir.1989), *cert. denied*, 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 753 (1990).

Even if the State is correct in its assertion, more of the argument is available for review than just the reference to escape. The prosecutor did more than merely tell the jury that they were at risk if they sentenced Miller to life imprisonment. He created an interwoven theme that culminated with this comment. That theme began with the comment about life imprisonment's being an unacceptable compromise because of Miller's history of escape. It continued with the reference to Miller's failure to take the stand and ask for mercy, and his previous attempt to deny killing Bolin. These actions demonstrated that Miller was "tough" and uncaring, and undeserving of mercy. That conclusion was bolstered by the prosecutor's 20–year experience with "a lot of criminals and a lot of people," in which he had "never seen me one that was as tough" as Miller. As the theme progressed, Miller was described as a mad dog, and the jury was told that "[y]ou don't do but one thing with a mad dog. You put him to death...." At this point, the theme reached its climax with a description of the "terrible risk" that the jury would be taking if it sentenced Miller "to life imprisonment with him having escaped once already...." Miller's counsel then moved for a mistrial. We think the motion, in context, fairly raised the issue of the propriety of the entire interconnected closing argument of the prosecution. Thus, we may address the merits of that issue now.

■ We find the comments outlined above analogous to those that we held to be a due-process violation in *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir.1989), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). There we reviewed a closing statement

> in which the prosecutor (1) expressed his personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record; (2) emphasized his position of authority as a prosecuting attorney of St. Louis County; (3) attempted to link petitioner with several well-known mass murderers; (4) appealed to the jurors' personal fears and emotions; and (5) asked the jurors to "kill him now. Kill him now."

*Id.* at 1335 (citation omitted). These remarks were "neither isolated nor ambiguous." Neither the defense attorney nor the prosecutor cured the erroneous arguments. Finally, "the trial judge made no comment *sua sponte* to the jury and issued no curative instruction after the closing argument was completed." *Id.* at 1337. The only arguably curative instruction, that closing arguments are not evidence, was wholly inadequate.

Similarly, the jury in Miller's trial was subjected to a well-planned theme that was "neither isolated nor ambiguous." The prosecutor "expressed his personal belief in the propriety of the death sentence" for Miller based largely on his experience with criminals during his 20–year career, just as the prosecutor in *Newlon* stressed the propriety of the death penalty in that case based on his ten-year career. *Id.* at 1336. In Miller's trial, the prosecutor played on the "jurors' personal fears and emotions" by calling Miller an escape artist who posed a threat to society, just as Newlon's prosecutor made a "personalized analogy to the jurors' self-defense of their own children." *Ibid.* Finally, we see very little difference between calling Miller a "mad dog" who should be "put to death" and the plea in *Newlon* to "Kill him now. Kill him now."

One difference in the two cases, however, makes the due-process violation in Miller's case more egregious. The prosecutor used Miller's decision not to testify in the penalty phase of the trial to Miller's disadvantage by arguing that it evidenced his "tough" character and that he did not care about what he had done. As a result, Miller was undeserving of mercy.

We view these comments as a direct attempt to penalize Miller for "exercising a constitutional privilege." *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). This sort of "comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' *Murphy v. Waterfront Comm'n.*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964), which the Fifth Amendment outlaws." *Ibid.* Moreover, as the Supreme Court has made abundantly clear, "[w]hen specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871. This point alone is enough for us to hold that Miller was prejudiced by the comments. Combined with the other statements that we find objectionable, we have no trouble concluding that the prosecutor's statements created the most severe "type of prejudice" to Miller.

Little or nothing was done to reduce this prejudice. We have no record of defense counsel's closing, but the State has not argued that it minimized the prejudice. As for the prosecutor, in response to Miller's motion for a mistrial, he merely stated to the jury that the risk to which he referred was to society in general. This statement does little or nothing to address the prejudice suffered by Miller. Finally, the trial court, far from attempting to cure the prejudice, gave the prosecutor's statement the court's approval by denying the motion and telling the prosecutor that he could continue. The only arguably "curative" instruction given, just as in *Newlon*, was that arguments of counsel are not evidence. The State's assertion that this instruction, given in the guilt phase of the trial, somehow "cures any error made by the prosecutor is without merit." *Newlon*, 885 F.2d at 1337.

Finally, "there is a reasonable probability that, but for the prosecutor's [statements], the outcome of this sentencing proceeding

might have been different." *Antwine*, 54 F.3d at 1364. While the jury found that no mitigating circumstances existed, the evidence supporting two of the four aggravating circumstances was scant at best. See *infra* Part V. See also *Miller v. State*, 269 Ark. 341, 358, 605 S.W.2d 430, 441 (1980) (Fogleman, C.J., dissenting), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981). Moreover, the jury had life imprisonment as an option even if the aggravating circumstances did outweigh the mitigating circumstances. See Ark.Stat.Ann. § 41–1302 (now codified at Ark.Code Ann. § 5–4–603). Finally, Miller did present a colorable defense to the charges, including the testimony of family members who claimed that Miller was with them when the murder took place, even in the face of substantial evidence against him. We hold that the prosecutor's statements "were so egregious that they fatally infected the proceedings and rendered [Miller's] entire trial fundamentally unfair." *Moore v. Wyrick*, 760 F.2d 884, 886 (8th Cir.1985).

■ Our conclusion makes it unnecessary to address the State's procedural-bar defense for the remainder of the prosecutor's statements. We note, however, that both of the remaining statements were improper. We have previously held that "[t]here is simply no legal or ethical justification for imposing the death penalty" on the basis that it is less costly than life imprisonment. *Blair v. Armontrout*, 916 F.2d 1310, 1323 (8th Cir. 1990), *cert. denied*, 502 U.S. 825, 112 S.Ct. 89, 116 L.Ed.2d 62 (1991). Likewise, no evidence was introduced regarding the wishes of the family; therefore the comment should not have been made. We agree with that part of the District Court's order setting aside Miller's sentence because the prosecutor's closing argument violated the Due Process Clause.

### IV.

■ The District Court also held that Miller's sentence was invalid because the verdict forms required the jury to find mitigating circumstances unanimously in violation of *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In those cases, the Supreme Court held invalid mitigating-circumstances instructions that contained a unanimity requirement. While Miller's jury was not specifically instructed by the trial judge that it must find mitigating circumstances unanimously, the verdict form on which it was to report its findings did expressly require a unanimous finding of mitigating circumstances. Thus, the *Mills* and *McKoy* issue was raised. Miller objected to this instruction at trial, presented a substitute instruction, and raised the issue in his direct appeal.

We nevertheless agree with the State that *Mills* and *McKoy* cannot help Miller in this case. Both *Mills* and *McKoy* were announced well after Miller's conviction became final in 1981. Therefore, if *Mills* and *McKoy* announced a "new rule," they cannot be applied retroactively to benefit Miller in this collateral attack. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). Under *Teague*, a "new rule" is one which "breaks new ground or imposes a new obligation on the States or the Federal Government.... To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 S.Ct. at 1070 (citations omitted). We hold that *Mills* and *McKoy* announced a new rule for *Teague* purposes.

Miller argues, and the District Court held, that the results in *Mills* and *McKoy* were "dictated" by prior Supreme Court precedent, namely *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett*, the Court held that a capital sentencer must be allowed to consider "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2965 (plurality opinion). Ohio's statute limited the mitigating circumstances that could be considered, and, thus, was invalid.

It is true that both *Mills* and *McKoy* cite *Lockett* as one basis for holding that a una-

nimity requirement for mitigating circumstances is unconstitutional because it limits the mitigating circumstances that the sentencer may consider. See *McKoy,* 494 U.S. at 438, 110 S.Ct. at 1231; *Mills,* 486 U.S. at 374, 108 S.Ct. at 1865. But see *McKoy,* 494 U.S. at 452–53, 110 S.Ct. at 1238–39 (Kennedy, J., concurring in the judgment) ("The court's reliance on our decision[ ] in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ... to support today's result stretches those cases beyond their proper bounds...."). However, as the Court has made clear, even if prior decisions " 'inform, or even control or govern, the analysis of [the] claim, it does not follow that they compel the rule....' " *Sawyer v. Smith,* 497 U.S. 227, 236, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990) (quoting *Saffle v. Parks,* 494 U.S. 484, 491, 110 S.Ct. 1257, 1261–62, 108 L.Ed.2d 415 (1990)).

*Lockett* 's holding may, indeed, "inform, or even control or govern," *Mills* and *McKoy.* Notably, however, four justices disputed even that conclusion. See *McKoy,* 494 U.S. at 452–53, 110 S.Ct. at 1238–39 (Kennedy, J., concurring in the judgment); *id.* at 471, 110 S.Ct. at 1248 (Scalia, J., dissenting). *Cf. Sawyer,* 497 U.S. at 236–37, 110 S.Ct. at 2828–29 (noting that the fact that three justices dissented in a prior case casts doubt on the argument that the holding in that case was compelled by prior precedent). But *Lockett* 's holding that sentencers should be allowed to consider any evidence in mitigation simply does not "compel" the further holding that a unanimity requirement for mitigating circumstances is unconstitutional. *Mills* and *McKoy* announced a new rule of law that cannot be applied retroactively on collateral attack to benefit Miller. *Accord, Cordova v. Collins,* 953 F.2d 167, 173 (5th Cir.), *cert. denied,* 502 U.S. 1067, 112 S.Ct. 959, 117 L.Ed.2d 125 (1992). We do not agree with that part of the District Court's opinion setting aside Miller's sentence on this ground.[6]

## V.

The jury found that four aggravating circumstances existed beyond a reasonable doubt. Miller contends, and the District Court held, that the evidence supporting two of those circumstances was insufficient to support the finding. Moreover, the District Court held that the Arkansas Supreme Court's review of this issue applied the wrong standard, thus freeing the District Court to examine the findings of the jury anew, without the presumption of correctness mandated by 28 U.S.C. § 2254(d).

We disagree initially with Miller's characterization of the Arkansas Supreme Court's review. Under the Arkansas capital-sentencing scheme, Arkansas Supreme Court review is a "means for the judiciary to check the wanton, arbitrary or capricious exercise of the power and discretion of the jury to determine who shall die for the crime of murder." *Collins v. State,* 261 Ark. 195, 220, 548 S.W.2d 106, 120, *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977). When performing this review, the Arkansas Supreme Court "will review the sufficiency of the State's evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Coulter v. State,* 304 Ark. 527, 533, 804 S.W.2d 348, 351–52, *cert. denied,* 502 U.S. 829, 112 S.Ct. 102, 116 L.Ed.2d 72 (1991) (citing *Lewis v. Jeffers,* 497 U.S. 764, 780–82, 110 S.Ct. 3092, 3102–03, 111 L.Ed.2d 606 (1990)).

While some language in the Arkansas Court's opinion could be read to indicate that a less-than-adequate standard may have been applied, see *Miller v. State,* 269 Ark. 341, 355, 605 S.W.2d 430, 439 (1980), the Arkansas Court ultimately employed the correct standard. Addressing one of the disputed circumstances, the Court stated that "[t]he jury could reasonably have found that appellant knowingly created a great risk of death to Mr. Hudson when he tried to get him inside the store." *Id.* at 356, 605 S.W.2d at 439. Even more to the point, in addressing the other circumstance, the Court stated that

---

**6.** Miller does not argue that any of the exceptions to *Teague* applies. We note that if Miller is retried, he will be entitled to the benefit of *Mills* and *McKoy, Teague* notwithstanding, because the new trial will, of course, take place after the decision of *Mills* and *McKoy.*

"[o]nce again, we think there was sufficient evidence for the jury to find beyond a reasonable doubt that appellant killed the deceased to eliminate a witness and thus avoid arrest for the robbery." *Ibid.*, 605 S.W.2d at 440. We hold that, regardless of the ambiguous language to the contrary, the Arkansas Supreme Court afforded Miller the standard of review that he was due.

■ The four aggravating circumstances found by the jury were: that Miller committed murder for pecuniary gain, in this case, robbery; that he had previously committed a violent felony or one which created a substantial risk of death or serious bodily injury to another; that he murdered Bolin to avoid or prevent arrest or effect escape from custody; and that when he murdered Bolin, Miller created a great risk of death to a person other than the victim. Miller challenges the last two findings. As a federal court reviewing a state court's findings on habeas review, we must determine whether a "rational factfinder" could have come to these conclusions, viewing all of the evidence " 'in the light most favorable to the prosecution.' " *Lewis v. Jeffers*, 497 U.S. 764, 781, 110 S.Ct. 3092, 3102–03, 111 L.Ed.2d 606 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

■ We have held that if a murder is committed during a robbery, it is reasonable to infer that the murder was committed "to ensure that [the defendant] would not be reported and arrested." *Grubbs v. Delo*, 948 F.2d 1459, 1470 (8th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 109, 121 L.Ed.2d 67 (1992). We are bound by this precedent. Miller does not dispute the sufficiency of the finding that Bolin was murdered during a robbery. Thus, we cannot agree with the District Court's holding that insufficient evidence existed that Miller committed the murder in order to avoid arrest.

■ Likewise, we hold that the evidence was sufficient for the jury to conclude that the murder of Bolin knowingly created a great risk of death to others. Bolin was killed in a downtown business district at 10:00 in the morning when he was shot with a handgun. A jury could reasonably con-

clude that discharging a gun in these circumstances would put others at risk. Moreover, a jury could reasonably conclude that the sound of a handgun would attract others to the scene, a circumstance which actually occurred, thus putting those others at risk.

Certainly, the evidence supporting these aggravating circumstances is less than overwhelming. It could be described as borderline at best. We cannot say, however, that it is unreasonable, much less "arbitrary or capricious." See *Jeffers*, 497 U.S. at 782, 110 S.Ct. at 3103. We disagree with that part of the District Court's order setting aside Miller's sentence on this ground.

## VI.

For the reasons given in Parts I and II of this opinion, the judgment of the District Court granting Miller's petition for habeas corpus is affirmed. Miller's conviction and sentence are invalid under the Constitution of the United States, and they are set aside and held for naught. Miller must be released unless the State of Arkansas commences proceedings to retry him within such reasonable time as the District Court, on remand, may fix.

Affirmed and remanded.