

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-14-2003

# Banks v. Horn

Precedential or Non-Precedential: Precedential

Docket 99-9005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Banks v. Horn" (2003). *2003 Decisions.* Paper 821.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/821

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-9005

GEORGE E. BANKS,
        Appellant

v.

MARTIN HORN, Commissioner, PA Dept of Corrections;
JAMES PRICE, Superintendent of State Correctional
Institute Greene; RAYMOND J. COLLERAN,
Superintendent State Correctional Institute Waymart;
COMMONWEALTH OF PENNSYLVANIA

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 99-cv-00438)
District Judge: Honorable James F. McClure, Jr.

Argued April 2, 2001 and
On Remand from the United States Supreme Court
by Order of June 17, 2002

Before: SLOVITER, ROTH and RENDELL, Circuit Ju dges

(Filed: January 14, 2003)


        Albert J. Flora, Jr., Esq. [ARGUED]
        33 West South Street
        Wilkes-Barre, PA 18701
        William Ruzzo, Esq.
        400 Third Avenue, Suite 109
        Kingston, PA 18704
         Counsel for Appellant
        George E. Banks

        Scott C. Gartley, Esq. [ARGUED]
        David W. Lupas, Esq.
        Office of District Attorney
        200 North River Street
        Luzerne County Courthouse
        Wilkes-Barre, PA 18711
         Counsel for Appellee
        Commonwealth of PA

        Peter Goldberger, Esq.
        Law Office of Peter Goldberger
        50 Rittenhouse Place
        Ardmore, PA 19003-2276
         Counsel for Amicus-Appellant
        PA Association of Criminal Defense

Lawyers

Louis M. Natali, Esq. [ARGUED]
Turner & McDonald
1725 Spruce Street
Philadelphia, PA 19103
 Counsel for Amicus-Appellants
PA Association of Criminal Defense
Lawyers and Louis M. Natali

OPINION OF THE COURT

RENDELL, Circuit Judge:

In Horn v. Banks, 122 S. Ct. 2147 (2002), the United
States Supreme Court directed us to analyze whether Mills
v. Maryland, 486 U.S. 367 (1988), could be retroactively
applied under the principles articulated in Teague v. Lane,
489 U.S. 288 (1989), for purposes of our collateral review of

2

George Banks's conviction and sentence. As a result, the
Court reversed that portion of our opinion in Banks v.
Horn, 271 F.3d 527 (3d Cir. 2001), dealing with Teague. We
now conclude that Mills did not announce a new rule of
constitutional law for retroactivity purposes, and thus that
our analysis and resolution of Banks's Mills claims was
proper. Accordingly, we will endorse the reasoning set forth
in the remainder of our prior opinion.

I.

George Banks was sentenced to death for the murder of
thirteen people in Wilkes-Barre, Pennsylvania, in 1982. His
conviction and sentence were upheld by the Supreme Court
of Pennsylvania on direct appeal, Commonwealth v. Banks,
521 A.2d 1 (Pa. 1987), and on appeal for state post-
conviction relief. Commonwealth v. Banks, 656 A.2d 467
(Pa. 1995). Banks then sought a writ of habeas corpus in
the Middle District of Pennsylvania, which was denied in
August of 1999. Banks v. Horn, 63 F. Supp. 2d 525 (M.D.
Pa. 1999).

On October 31, 2001, we reversed the District Court and
granted Banks a provisional writ of habeas corpus, finding
meritorious Banks's argument that his death sentence was
unconstitutional. Banks v. Horn, 271 F.3d 527 (3d Cir.
2001) ("Banks I"). Specifically, we found that the sentencing
phase instructions and forms violated Mills v. Maryland,
486 U.S. 367 (1988). In Mills, the United States Supreme
Court reversed a death sentence where there was a
substantial probability that a reasonable jury could have
understood the sentencing instructions and forms to
disallow the consideration of mitigating factors not
unanimously found to exist. Id. at 384. In Banks I, we
concluded that based on the language of the instructions
and verdict slip employed in Banks's penalty phase, a
reasonable possibility existed that the jurors believed they

were precluded from considering mitigating evidence they had not found unanimously. Banks I, 271 F.3d at 547-551.

In reaching that conclusion, we were presented with the question of whether Mills was applicable for purposes of our collateral review of Banks's conviction and sentence under

3

Teague v. Lane, 489 U.S. 288 (1989). In Teague, the Supreme Court revolutionized the structure for analyzing the retroactivity of criminal procedure decisions, holding that, with rare exception, prisoners may not rely on"new rules" -- essentially, rules not settled by pre-existing precedent -- for purposes of federal habeas corpus review. Id. at 299-301. Teague thus directed that new decisions of constitutional criminal procedure that are favorable to a prisoner are usually inapplicable once the prisoner has fully exhausted her direct appeals, including the filing of a writ of certiorari to the United States Supreme Court. Id.

Teague's new rule of nonretroactivity was premised at least in part on a respect for the workings of state courts and state judges appropriate to our federal system. In particular, the Supreme Court has noted that by validating "reasonable, good-faith interpretations of existing precedents made by state courts," the principles of nonretroactivity established in Teague "effectuate[ ] the States' interest in the finality of criminal convictions and foster[ ] comity between federal and state courts." Gilmore v. Taylor, 508 U.S. 333, 340 (1993); see also Teague, 489 U.S. at 308.

Because Banks's conviction became final in October of 1987,1 eight months before the Supreme Court issued its decision in Mills, one of the Commonwealth's primary arguments before us in Banks I was that Mills was not applicable to Banks's petition for habeas relief. We disagreed. We reasoned that, although Teague"retroactivity is a 'threshold question,' " Banks I , 271 F.3d at 541 (quoting Teague, 489 U.S. at 300), because the Pennsylvania Supreme Court decision itself applied Mills (albeit doing so unreasonably), neither Teague , nor its underlying purposes, required us to perform a retroactivity analysis of Mills. Banks I, 271 F.3d at 541-43. Instead, we

---

1. A conviction becomes final for Teague purposes "when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390 (1994). Banks's conviction was therefore final when the Supreme Court denied certiorari on October 5, 1987. Banks v. Pennsylvania, 484 U.S. 873 (1987).

4

found it necessary only to review the merits of the

Pennsylvania Supreme Court's decision, concluding:

> Teague teaches that the federal courts in habeas
> corpus proceedings should be reluctant to apply new
> rules of federal jurisprudence in state court cases
> decided before such new rules were handed down.
> Principles of comity and finality counsel that we
> maintain a circumscribed scope of habeas review. Here,
> however, . . . the Pennsylvania Supreme Court applied
> Mills. We are examining the application of Mills, not
> because we wish to impose a new rule not considered
> by the Pennsylvania Supreme Court, but as the court
> in fact did consider and apply it. In such a situation,
> Teague is not implicated. Accordingly, we need ask
> only whether the Pennsylvania Supreme Court's
> application of Mills should be disturbed under [the
> appropriate standard of review].

Id. at 543 (citations omitted). Accordingly, we held that
resolution of the retroactivity of Mills under Teague was
unnecessary, and proceeded directly to our examination of
the merits of the Pennsylvania Supreme Court's application
of Mills to the facts presented in Banks's appeal. As noted
above, we resolved that question in Banks's favor, holding
that the sentencing phase jury instructions and forms were
clearly unconstitutional, and therefore that the
Pennsylvania Supreme Court's decision finding otherwise
involved an unreasonable application of established
Supreme Court precedent. Id. at 551.

In Horn v. Banks, 122 S. Ct. 2147, 2148 (2002) ("Banks
II"), the Supreme Court concluded otherwise, explicitly and
emphatically holding that "federal courts must address the
Teague question when it is properly argued by the
government." In doing so, the Court focused on its
statements in Caspari v. Bohlen, 510 U.S. 383 (1994), that
Teague's "nonretroactivity principle prevents a federal court
from granting habeas corpus relief to a state prisoner based
on a" new rule, and thus that "if the State . . . argue[s] that
the defendant seeks the benefit of a new rule of
constitutional law, the court must apply Teague before
considering the merits of the claim." Id. at 389 (emphasis in
original). Applying these principles, the Supreme Court

5

found that it was "incumbent upon" us to "perform a
Teague analysis before granting respondent relief under
Mills," and that we "erred in concluding that [we] did 'not
need to focus on anything other than the reasoning and
determination of the Pennsylvania Supreme Court.' " Banks
II, 122 S. Ct. at 2150 (quoting Banks I, 271 F.3d at 541).
Accordingly, the Supreme Court "reverse[d][our] holding
that 'Teague is not implicated' by this case, and remand[ed]
for further proceedings consistent with" its decision. Banks
II, 122 S. Ct. at 2151 (quoting Banks I, 271 F.3d at 543).2

II.

We note at the outset that our determination as to the merits of Banks's Mills claim was not reviewed by the Supreme Court. The Court thus did not vacate our previous decision but only reversed that portion of our opinion that concluded that a Teague analysis was unnecessary for our review of Banks's habeas petition. Accordingly, the sole issue presently before us is whether our application of Mills on habeas review of Banks's sentence was improper under the Supreme Court's nonretroactivity jurisprudence. 3 To provide background for the analysis, we first briefly discuss the Court's decision in Mills itself, then turn to an examination of the Supreme Court's retroactivity framework.

A.

In Mills, the Court considered the constitutionality of a set of jury instructions, as well as the implementing verdict forms, that could be understood to prevent the

_____

2. On July 12, 2002, Banks filed a Petition for Rehearing. The Supreme Court recalled its issuance of judgment on July 17, but on August 26, the Court denied rehearing and reissued judgment.

3. This is not the first time we have been presented with the issue of the retroactivity of Mills. In Zettlemoyer v. Fulcomer, 923 F.2d 284, 306 n.19 (3d Cir. 1991), we "decided to reach the merits of the Mills claim . . . [but] did not expressly hold whether Mills falls outside the Teague bar." Frey v. Fulcomer, 132 F.3d 916, 920 n.4 (3d Cir. 1997). In Frey, we noted the issue but did not reach it because the Commonwealth failed to raise it, and we deemed it waived. Id.

6

consideration of mitigating circumstances if the jury was not unanimous in finding the existence of such circumstances. Mills, 486 U.S. at 371. That is, "even if some or all of the jurors were to believe some mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the same mitigating factor, the sentence necessarily would be death."4 Id. (emphasis in original). The Court cited the following two possibilities as constitutionally problematic:

> If eleven jurors agree that there are six mitigating circumstances, the result is that no mitigating circumstance is found. Consequently, there is nothing to weigh against any aggravating circumstance found and the judgment is death even though eleven jurors think the death penalty wholly inappropriate. . . .
>
> [In] a situation just as intuitively disturbing: All 12 jurors might agree that some mitigating circumstances were present, and even that those mitigating circumstances were significant enough to outweigh any aggravating circumstance found to exist. But unless all 12 could agree that the same mitigating circumstance was present, they would never be permitted to engage

> in the weighing process or any deliberation on the
> appropriateness of the death penalty.

Id. at 373-74 (citations omitted). Noting that imposition of the death penalty under such circumstances would"be the height of arbitrariness," id. at 374, it went on to state:

> It is beyond dispute that in a capital case the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. The corollary that the sentencer may not refuse

---

4. The Maryland Court of Appeals upheld the sentence of death. See Mills v. State, 527 A.2d 3 (1987). Although it agreed that "if the statute and form were read as petitioner suggested, jurors would be improperly prevented from giving due consideration to mitigating evidence," see Mills, 486 U.S. at 372 (emphasis in original), the Court of Appeals adopted a construction of the statute exonerating it from the potential constitutional issue. See Mills, 527 A.2d at 12-17.

> to consider or be precluded from considering any relevant mitigating evidence is equally well established.

Id. at 374-75 (first and third emphasis added) (quotations and citations omitted). The Court then reiterated the constitutional problem at hand: "[I]f petitioner is correct, a jury that does not unanimously agree on the existence of any mitigating circumstance may not give mitigating evidence any effect whatsoever, and must impose the sentence of death." Id. at 375. The Court stated that its existing jurisprudence prohibited any "barrier to the sentencer's consideration of all mitigating evidence. . . . [w]hatever [its] cause." Id. As the Court found a "substantial probability" that reasonable jurors would have understood themselves as being precluded from considering mitigating evidence not found unanimously, the Court reversed Mills's sentence of death, concluding: "Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." Id. at 384.

B.

Again, the sole issue before us is whether the rule enunciated in Mills is retroactively applicable to Banks's appeal. Retroactivity analysis is governed by the principles first articulated in Teague v. Lane, in which the Supreme Court held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. Application of this principle of retroactivity

proceeds in three steps. See, e.g., Caspari, 510 U.S. at 390. First, we must determine when the defendant's conviction became final. Id. Second, we must survey the legal landscape to determine whether or not the case in question announced a new rule of constitutional law. Id. Finally, if we determine that the case did announce a new rule, we must consider whether it fits into one of the two exceptions to nonretroactivity. Id. Those exceptions are reserved for (1) rules that "place[ ] a class of private conduct beyond the

power of the State to proscribe, . . . or address[ ] a substantive categorical guarantee accorded by the Constitution, such as a rule prohibiting a certain category of punishment for a class of defendants because of their status or offense," or (2) "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle v. Parks, 494 U.S. 484, 494-95 (1990) (citations and internal quotations omitted). Because the exceptions find rather narrow applicability, however, the typically dispositive step in the Teague retroactivity analysis is the determination of whether the implicated constitutional principle qualifies as a "new rule."

In Teague itself, the Court admitted that it is "often difficult to determine" whether a case announces a new rule, and explicitly avoided any "attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes." Teague, 489 U.S. at 301. The Supreme Court has further recognized that the inquiry is particularly difficult where the decision in question merely extended the reasoning of prior cases. See, e.g., Saffle, 494 U.S. at 488; Graham v. Collins, 506 U.S. 461, 467 (1993); Butler v. McKellar, 494 U.S. 407, 412-13 (1990); see also Mackey v. United States, 401 U.S. 667, 695 (1971) (Harlan, J., concurring in judgments in part and dissenting in part) (noting the "inevitable difficulties" in distinguishing new rules from the application of old rules in analogous cases).

Perhaps as a result of the inevitable difficulty in articulating one test to govern all possible retroactivity scenarios, the Supreme Court has "stated variously the formula for determining when a rule is new." O'Dell v. Netherland, 521 U.S. 151, 156 (1997). Under the Court's original explication in Teague, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." Teague, 489 U.S. at 301 (emphasis added). "To put it differently," the Teague Court explained,"a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." Id. (emphasis in original); see also, e.g., Graham, 506 U.S. at 467 ("A holding constitutes a new rule within the

meaning of Teague if it breaks new ground, imposes a new obligation on the States or the Federal Government, or was not dictated by precedent existing at the time the defendant's conviction became final." (quotations omitted) (emphasis in original)). Similarly, the Court has stated that previous precedents must not simply "inform, or even control or govern" the analysis, but instead must "compel the rule" sought by the defendant. Saffle, 494 U.S. at 491; see also Butler, 494 U.S. at 415 (noting that it is insufficient that a decision was considered to be controlled or governed by prior opinions).

At the same time, the Court has focused on the decision-making process confronting state court judges. See, e.g., O'Dell, 521 U.S. at 156 ("At bottom, . . . the Teague doctrine 'validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.' " (quoting Butler, 494 U.S. at 414)); Graham, 506 U.S. at 467; Teague, 489 U.S. at 308. And, in recent decisions, the Court has approached the inquiry from the standpoint of a "reasonable jurist." In Lambrix v. Singletary, 520 U.S. 518 (1997), for instance, the Court asked whether the "unlawfulness of [the defendant's] conviction was apparent to all reasonable jurists." Id. at 527-28; see also id. at 531 (examining whether a "reasonable jurist . . . could have reached a conclusion different from" the one ultimately reached by the Supreme Court); id. at 526 (stating that our inquiry is to "determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution" (quotations omitted)); O'Dell , 521 U.S. at 166 ("Teague asks state court judges to judge reasonably, not presciently."). In sum, "unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so now." Graham, 506 U.S. at 467 (quoting Saffle, 494 U.S. at 488).

10

III.

We hold that Mills did not announce a new rule of constitutional law for retroactivity purposes, and accordingly that our application of Mills on our habeas review of Banks's sentence was completely proper. 5 There are four aspects to our reasoning: (1) the legal landscape at the time of Banks's conviction, (2) the Supreme Court's decision in Mills itself, (3) the relevant post-Mills decisions of the Supreme Court, and (4) the opinions of our sister Courts of Appeals who have addressed whether Teague bars retroactive application of Mills.

Our "first and principal task" under Teague is to survey the legal landscape to determine whether Mills  "was dictated by then existing precedent . . . that is,[whether] the unlawfulness [of the situation in Mills ] was apparent to

all reasonable jurists." Lambrix, 520 U.S. at 527-28. As discussed above, in Mills the Supreme Court reversed a sentence of death where there was "a substantial probability that reasonable jurors, upon receiving the judge's instructions in th[e] case, and in attempting to complete the verdict form as instructed, . . . thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of " any particular circumstance. Mills, 486 U.S. at 384. We find highly persuasive Banks's argument that, given the legal landscape, Mills represented merely an application of the

_____

5. Because we conclude that Mills did not announce a new rule under Teague, we need not address Banks's arguments regarding whether Mills falls within one of the two exceptions to nonretroactivity. We note, however, that in Williams v. Dixon, 961 F.2d 448, 454-56 (4th Cir. 1992), the Court of Appeals for the Fourth Circuit held that Teague does not bar application of Mills (and McKoy v. North Carolina, 494 U.S. 433 (1990)) on habeas because they are "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Graham, 506 U.S. at 478 (quotations omitted); see also Gall v. Parker, 231 F.3d 265, 323 (6th Cir. 2000) (holding that Mills did not announce a new rule under Teague but also finding that, even if Mills did announce a new rule, it falls within the second Teague exception); Jermyn v. Horn, No. 97-634, 1998 WL 754567, at *36-39 (M.D. Pa. Oct. 27, 1998) (holding that Mills is a new rule but falls within the second Teague exception).

11

well established constitutional rule that the Eighth Amendment prohibits all barriers to the sentencer's consideration of any and all mitigation evidence in the penalty phase of a capital trial.

By the time Banks's conviction became final in 1987, the legal landscape was primarily defined by Supreme Court case law spanning nearly a dozen years.6  We begin our examination of this precedent with the Supreme Court's decision in Woodson v. North Carolina, 428 U.S. 280 (1976), which struck down North Carolina's mandatory death penalty statute. Of the many constitutional flaws the plurality found in North Carolina's capital sentencing structure,7 one particularly notable defect was its "failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." Woodson, 428 U.S. at 303; see also Roberts (Stanislaus) v. Louisiana, 428 U.S. 325 (1977) (striking down Louisiana's mandatory death penalty statute). The plurality reiterated that death as a penalty is distinguishable in kind from all other penalties, and held that "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson, 428 U.S. at 304 (citations omitted); see also Roberts, 428 U.S. at 333-34

(plurality opinion) (noting that the Constitution requires a
"focus on the circumstances of the particular offense and
the character and propensities of the offender"); Jurek v.

---

6. It is worth noting that although the Supreme Court has instructed
that "the reasonable views of state courts are entitled to consideration"
as part of the legal landscape, Caspari v. Bohlen, 510 U.S. 383, 395
(1994), both parties have focused exclusively on Supreme Court
precedent. At any rate, we believe that here the Supreme Court's case
law adequately depicts the legal landscape at the time of Banks's
conviction.

7. The Court's opinion in Woodson was a plurality of three -- Justices
Powell, Stevens, and Stewart. Justices Brennan and Marshall both
concurred in the judgment given their opinion that capital punishment
inherently violates the Eighth and Fourteenth Amendments.

12

Texas, 428 U.S. 262, 271 (1976) (plurality opinion) (stating
that the Eighth and Fourteenth Amendments require that
the sentencer be allowed to consider mitigating
circumstances).

The Court articulated the full import of Woodson 's
constitutional directive more clearly in Lockett v. Ohio, 438
U.S. 586 (1978), in which it struck down a statute that
restricted the range of mitigating factors that could be
considered by a jury.8 Whereas Woodson involved a statute
precluding any consideration of mitigating evidence, Lockett
involved somewhat more complex questions: "which facets
of an offender or his offense [are] relevant in capital
sentencing," and "what degree of consideration of relevant
facets" does the Constitution require. Id.  at 604. The Court
responded, in expansive language, that:

> [T]he Eighth and Fourteenth Amendments require that
> the sentencer . . . not be precluded from considering,
> as a mitigating factor, any aspect of a defendant's
> character or record and any of the circumstances of
> the offense that the defendant proffers as a basis for a
> sentence less than death.

Id. (first emphasis added). The Court explained that:

> Given that the imposition of death by public authority
> is so profoundly different from all other penalties, we
> cannot avoid the conclusion that an individualized
> decision is essential in capital cases. The need for
> treating each defendant in a capital case with that
> degree of respect due the uniqueness of the individual
> is far more important than in noncapital cases. . . . .
>
>  There is no perfect procedure for deciding in which
> cases governmental authority should be used to impose
> death. But a statute that prevents the sentencer in all
> capital cases from giving independent mitigating weight
> to aspects of the defendant's character and record and

to circumstances of the offense proffered in mitigation

_____

8. Lockett's plurality opinion was written by Chief Justice Burger and joined by Justices Powell, Stevens, and Stewart. Justice Brennan took no part in the case, and Justice Marshall again concurred on the ground that capital punishment is always unconstitutional.

13

> creates the risk that the death penalty will be imposed
> in spite of factors which may call for a less severe
> penalty. When the choice is between life and death,
> that risk is unacceptable and incompatible with the
> commands of the Eighth and Fourteenth Amendments.

Id. at 605 (emphasis added). In Lockett , the Court stated in unequivocal terms that to "meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." Id. at 608.

Four years later, in Eddings v. Oklahoma, 455 U.S. 104 (1982), the constitutional rule articulated in Lockett was first adopted and applied by a majority of the Court. In Eddings, the statute in question allowed defendants to present evidence of any mitigating circumstance-- unlike the statute at issue in Lockett -- but the trial judge found that he was unable to consider certain mitigating evidence as a matter of law. Id. at 113. The Supreme Court reversed, describing Lockett as requiring that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor," id. at 112, and holding that:

> The limitations placed by these courts upon the
> mitigating evidence they would consider violated the
> rule in Lockett. Just as the State may not by statute
> preclude the sentencer from considering any mitigating
> factor, neither may the sentencer refuse to consider, as
> a matter of law, any relevant mitigating evidence . In
> this instance, it was as if the trial judge had instructed
> the jury to disregard the mitigating evidence proffered
> on his behalf. The sentencer . . . may determine the
> weight to be given relevant mitigating evidence. But
> they may not give it no weight by excluding such
> evidence from their consideration.

Id. at 113-115 (emphasis added). Thus, in Eddings, the Lockett plurality's constitutional rule was solidified as a settled and prominent feature of the Supreme Court's death penalty jurisprudence; indeed, the Court thereafter characterized the rule as one of the two prerequisites to a valid death sentence imposed by the Eighth Amendment. See California v. Brown, 479 U.S. 538, 541 (1987); see also Penry v. Lynaugh, 492 U.S. 302, 318 (1989) (stating that by

14

early 1986 "it was clear from Lockett and Eddings" that the

Constitution prohibited a State from "prevent[ing] the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty"). The legal landscape at the time of Banks's conviction, however, was further shaped by three additional cases in which the Court had occasion to apply the Lockett/Eddings rule.

First, in Skipper v. South Carolina, 476 U.S. 1 (1986), the Supreme Court relied on Lockett and Eddings to reverse the defendant's death sentence after the trial judge ruled that certain mitigating evidence was inadmissible and prohibited the sentencing jury from considering it. The Court began by reiterating its "well established" Lockett /Eddings rule, stating:

> There is no disputing that . . . in capital cases the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering any mitigating evidence.

Id. at 4 (quotations and citations omitted). The Court then addressed the sole question before it: "whether the exclusion from the sentencing hearing of the testimony petitioner proffered . . . deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." Id. Noting that it could"hardly be disputed" that the exclusion did have that effect, id., the Court concluded that "[t]he exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." Id. at 8.

A year later, in California v. Brown, 479 U.S. 538 (1987), the Court again affirmed the constitutional principles established in Lockett and Eddings, but this time upheld the underlying death sentence.9 In Brown, the defendant

---

9. The Supreme Court has made clear that Brown was not dictated by Lockett and Eddings. See Saffle, 494 U.S. at 494. Nonetheless, the

15

challenged the constitutionality of "an instruction informing jurors that they 'must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.' " Brown, 479 U.S. at 540. The Court began by reiterating that the Eighth Amendment requires that capital defendants be allowed to introduce any relevant mitigating evidence, and further that consideration of such evidence is a " 'constitutionally indispensable part of the process of inflicting the penalty of death.' " Brown, 479 U.S.

at 541 (quoting Woodson, 428 U.S. at 304). Applying these principles to the instruction before them, however, the Court found that it merely "prohibit[ed] juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial," limitations fully consistent with the Constitution's requirement that the jury be allowed to consider any mitigating evidence. Brown, 479 U.S. at 543; see also Saffle, 494 U.S. at 488-95 (holding that Teague precluded the defendant's constitutional challenge to a jury instruction requiring jurors to avoid the influence of sympathy in sentencing).

Finally, in Hitchcock v. Dugger, 481 U.S. 393 (1987), the Supreme Court unanimously reversed the defendant's death sentence where an "advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances." Id. at 398-99. The Court held that such a circumstance"did not comport with the requirements of Skipper, Eddings, and Lockett," id. at 399 (citations omitted), which established that "the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." Id. at 394 (quotations omitted). The Court concluded, "[O]ur cases hold that the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid." Id. at 399; see also Burger v. Kemp, 483 U.S. 776, 790 n.7 (1987) (affirming, in dicta, the constitutional principles established in Lockett and Eddings); Sumner v. Shuman, 483 U.S. 66, 75-76 (1987) (same).

_____

decision constitutes part of the legal landscape prior to Banks's conviction becoming final.

16

Although Banks relies primarily on the Lockett /Eddings line of cases, we mention another Supreme Court case, Andres v. United States, 333 U.S. 740 (1948), that was cited in Mills and relied on by another Court of Appeals in deciding this issue. See Mills, 486 U.S. at 377 & n.9; Gall v. Parker, 231 F.3d 265, 323 (6th Cir. 2001). Andres involved an assessment and interpretation of a federal death penalty statute, and the question of whether a trial court's unanimity instructions pursuant to that statute were erroneous. Id. at 746. The statutory scheme was structured such that the finding of guilt meant the automatic imposition of the death penalty unless the verdict was qualified by the phrase "without capital punishment." Id. The government argued that the jury's determination as to guilt was conclusive as to the death penalty unless the jury then unanimously decided to qualify the verdict. Id. The Supreme Court opined, however, that the proper construction required that the "jury's decision upon both guilt and whether the punishment of death should be imposed must be unanimous." Id. at 749. That is, the Court required that the jury consider and be unanimous that death should be the penalty imposed.

Although it recognized that "the interpretation .. . urged by the Government cannot be proven erroneous with certainty," the Court found its construction"more consonant with the general humanitarian purpose of the statute and the history of the Anglo-American jury system." Id. at 748-49. The Court then held that the instruction given to the jury by the District Court conveyed the erroneous interpretation of the statute. Id. at 749-52. Under the instructions given, the Court concluded, the jury might have erroneously but "reasonably conclude[d] that, if they [could not] all agree to grant mercy, the verdict of guilt must stand unqualified." Id. at 752. Accordingly, the Court overturned the sentence and ordered a new trial. Id.

Clearly, the Andres decision took place within a different statutory context and, in our view, is not a model of clarity. However, because it, like Mills, involved jury instructions on unanimity in a capital case, Andres certainly plays some role in the relevant legal landscape -- a conclusion reinforced by the Court's citation to it in Mills itself. See Mills, 486 U.S. at 377 & n.9. At the very least, Andres

17

invokes a number of themes that, significantly, are consistent with and complimentary to the Court's later constitutional death penalty jurisprudence. For instance, Andres indicates a concern for particular clarity in capital jury instructions, noting that doubts "should be resolved in favor of the accused." Andres, 333 U.S. at 752; see also Mills, 486 U.S. at 377. Further, it is particularly noteworthy that the upshot of the Court's decision was that the statute and jury instructions were interpreted to avoid a situation in which a juror could be prevented -- by operation of a requirement for unanimity to avoid the death penalty, and, accordingly, by the views of other jurors -- from giving effect to his or her belief that death was an inappropriate sentence under particular circumstances. Andres , 333 U.S. at 748-52.

We agree with Banks that this legal landscape -- as exemplified by Lockett and Eddings, but also including at least Andres, Woodson, Skipper , Brown, and Hitchcock -- strongly supports Banks's position that the Court in Mills did not develop any new principle of law, but instead merely relied upon clear and well established constitutional rules, such that Mills was compelled and dictated by the legal landscape, and no reasonable jurist could have reached a different result. Insofar as the landscape evidenced the Supreme Court's unwavering recognition and insistence that the Eighth Amendment prohibits any barrier to the sentencer's consideration of mitigating evidence, it provided a clear indication that a jury instruction that could work to prevent a juror from considering any and all mitigating evidence, whether because of unanimity requirements or otherwise, would be constitutionally infirm.

In reaching this conclusion, we are not unmindful of the difficulty of employing Teague's mandates to divine whether

the legal landscape supports a finding that a rule is or is not new, given the Court's various formulations of the measuring stick for determining whether a particular case does or does not announce a new rule. It is not precisely clear just how short the "step" must be between existing precedent and the current announcement, or how strong the pull of precedent must be in a certain direction. There certainly must be some gradation or difference, or the rule

18

in question would not be even arguably new. Thus, a decision that does extend reasoning may nonetheless be viewed as not "new" under Teague. The Supreme Court has acknowledged as much when it has noted the difficulty of determining whether a new rule was announced where "a decision extends the reasoning of our prior cases." Saffle, 494 U.S. 488; see also Graham, 506 U.S. at 467; Butler, 494 U.S. at 412-13. To read certain of the operative terms the Court has employed, such as "dictated" and "commanded," narrowly, such that they would require express direction from the existing precedent, would be to unrealistically require courts to have anticipated all future scenarios in order for later cases to not announce a new rule. Another term the Court has used, "compel," has been defined as to "force, drive, [or] impel." Webster's Third New Int'l Dictionary 463 (1993). This seems not only to be a more functional description of the test, but it also fits nicely with the concept of the "reasonable jurist" that is referenced in many of the Court's recent cases in this area. That is, we ask whether the existing precedent set forth a rule that all reasonable jurists would agree impels or drives the result in the new situation presented. Here, the existing case law clearly provided that sentencers could not be prevented from considering any and all mitigating evidence. In Mills, the Court merely recognized that the perceived need for unanimity could constitute one such unconstitutional barrier. Even if one were to question whether the result was "dictated" or "commanded" by the constitutional rule itself, it surely was compelled in the sense that previous pronouncements would constrain all reasonable jurists to conclude the situation in Mills to be unconstitutional. It is perhaps this shading that distinguishes our view of Mills from that of our concurring colleague.10

The Supreme Court's reasoning and rhetoric in Mills itself follows form from the legal landscape, and bolsters the view that it was not announcing a new constitutional rule. Initially, we note that "[i]t is significant" that Mills did

---

10. In her concurrence, Judge Sloviter focuses on whether Mills was "commanded" or "dictated" by the legal landscape in concluding that it announced a new rule.

19

explicitly and heavily rely on controlling precedent. Lambrix, 520 U.S. at 528. Unlike the situation in Lambrix , in which the Supreme Court found a "new rule" in part because the underlying decision cited only a single case -- and with a "cf." signal at that, see id. at 528-29 -- Mills is replete with references to controlling precedent; the Court frequently cited to and quoted from Lockett, Eddings, Skipper, and Hitchcock. See Mills, 486 U.S. at 374-76. Moreover, the Court used language in its analysis that does not merely state, but indeed exhorts, the rich precedent compelling its reasoning and result. The Court's precise wording bears repeating here:

> It would certainly be the height of arbitrariness to allow or require the imposition of the death penalty under the circumstances . . . postulated by petitioner . .. . It is beyond dispute that in a capital case " 'the sentencer [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " Eddings v. Oklahoma , 455 U.S. 104, 110, 102 S. Ct. 869, 874, 71 L.Ed.2d 1 (1982), quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978) (plurality opinion) (emphasis in original). See Skipper v. South Carolina, 476 U.S. 1, 4, 106 S. Ct. 1669, 1670-1671, 90 L.Ed.2d 1 (1986). The corollary that "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence' " is equally "well established." Ibid. (emphasis added), quoting Eddings, 455 U.S., at 114, 102 S. Ct., at 877.
>
> . . . .
>
> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, Lockett v. Ohio, supra; Hitchcock v. Dugger, 481 U.S. 393, 107 S. Ct. 1821, 95 L.Ed.2d 347 (1987); by the sentencing court, Eddings v. Oklahoma, supra; or by an evidentiary ruling, Skipper v. South Carolina, supra. The same must be true with respect to a single juror's holdout vote against finding the presence of a mitigating

20

> circumstance. Whatever the cause, if petitioner's interpretation of the sentencing process is correct, the conclusion would necessarily be the same: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of Lockett, it is our duty to remand this case for resentencing." Eddings v. Oklahoma, 455 U.S., at 117, n., 102 S. Ct., at 878, n. (O'Connor, J., concurring).
>
> The critical question, then, is whether petitioner's interpretation of the sentencing process is one a

> reasonable jury could have drawn from the
> instructions given by the trial judge and from the
> verdict form employed in this case.

Mills, 486 U.S. at 374-76. Given this language, it can hardly be disputed that Mills did not announce a new rule.[11] As the Court recognized, it was well established by the Lockett/Eddings line of cases that the Constitution prohibited any barrier to the jury's consideration of mitigating evidence, "[w]hatever the cause." Id. at 375. The relevant cases had never indicated that the source or form some particular barrier took would be relevant to its constitutionality; instead they had consistently and repeatedly prohibited, in clear language, any  barrier. See, e.g., Hitchcock, 481 U.S. at 394 ("[I]n capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." (quotations omitted)); Skipper, 476 U.S. at 4 (same); see also, e.g., Saffle, 494 U.S. at 491 ("Lockett and Eddings command that the State must allow the jury to give effect to mitigating evidence in making the sentencing decision."). The extent of the relevant holding in Mills, then, was merely its acknowledgment of a conclusion already required by the governing constitutional rules: that if a jury instruction and verdict form, because of its unanimity requirements,

_____

11. Although it has been noted that for Teague purposes an opinion's language is not always "conclusive," see, e.g., Butler, 494 U.S. at 415,we nonetheless find the Court's rhetoric and reasoning in Mills to be unique -- providing extensive "evidence tending to prove" that Mills did not announce a new rule. O'Dell, 521 U.S. at 161 n.2.

precluded juror consideration of any and all mitigation evidence, the resulting death sentence would be unconstitutional. See McKoy v. North Carolina , 494 U.S. 433, 438 (1990) ("[A]llowing a 'holdout' juror to prevent the other jurors from considering mitigating evidence violated the principle established in Lockett v. Ohio, that a sentencer may not be precluded from giving effect to all mitigating evidence." (citation omitted)). That these constitutional principles were settled before Mills is further evidenced by the Maryland Court of Appeals decision reversed by the Supreme Court in Mills itself, as the disagreement between the Court of Appeals' majority and dissenting opinions was unrelated to the underlying constitutional rules that govern capital sentencing. See Mills, 527 A.2d at 13; id. at 33 (McAuliffe, J., dissenting) ("[T]he majority and I are in essential agreement as to the basic principles of law that control in a capital sentencing proceeding. . . . A mitigating circumstance . . . must be considered by each juror who believes it to have been proven to exist, irrespective of whether all jurors agree that it exists."); Mills, 486 U.S. at 372 ("The [Maryland Court of Appeals] did not dispute that if the statute and form were read as petitioner suggested, jurors would be improperly prevented from giving due consideration to mitigating evidence."(emphasis in original));

see also Butler, 494 U.S. at 415 (indicating that actual disagreement on a constitutional rule provides some evidence that it is "new" under Teague).

Moreover, we note that recent Supreme Court references to the Teague test have indicated that the "determinative question" under Teague is whether reasonable jurists, reading the case law in existence at the time the conviction became final, could have concluded that Banks's sentencing "was not constitutionally infirm." Graham, 506 U.S. at 477 (emphasis in original); see also id. at 476 ("The result in a given case is not dictated by precedent if it is susceptible to debate among reasonable minds, or, put differently, if reasonable jurists may disagree." (quoting Stringer v. Black, 503 U.S. 222, 238 (1992) (Souter, J., dissenting)). Given the Supreme Court's reliance on the Lockett/Eddings rule as an established requirement of the Eighth Amendment by the time Banks's conviction became final, we are persuaded that the relevant rule in Mills was

22

"apparent," and that no "reasonable jurist" could have reached a different conclusion. Lambrix, 520 U.S. at 528; see also, e.g., Butler, 494 U.S. at 415 (asking whether the relevant outcome was "susceptible to debate among reasonable minds"). Indeed, as the settled Lockett/Eddings rule was a blanket prohibition on barriers to the jury's consideration of mitigating circumstances, we find ourselves unable to construct any analytic framework, consistent with the legal landscape, under which Mills could have come out differently. Cf. Lambrix, 520 U.S. at 532 ("There were at least three different . . . approaches that would have suggested a different outcome."). A failure to decide Mills as the Court in fact decided it would not just have taken an "illogical" or "grudging" application of the Lockett/Eddings rule, Butler, 494 U.S. at 415, it would have taken a completely untenable one. Any reasonable jurist "would have felt compelled" to decide Mills accordingly. O'Dell, 521 U.S. at 156 (quoting Lambrix, 520 U.S. at 527).

While the Commonwealth and our concurring colleague seize on the fact that there were four dissenting justices in Mills in arguing that "reasonable jurists" could have differed on the outcome at the time of that case, a careful reading of the Mills dissent makes clear that the dissenting justices did not take issue with the principle that jurors must be able to consider all mitigating factors without the requirement of unanimity. The dissenters never questioned the strong statements by the majority to the effect that the result in Mills was mandated by the Lockett/Eddings line of cases. Rather, they viewed the majority as having applied the wrong test as to the probability that jurors misunderstood the instructions in the factual setting presented. See Mills, 486 U.S. at 394 (Rehnquist, J., dissenting) ("[T]he question is whether a reasonable juror operating under the trial court's instructions would have considered evidence of mitigating circumstances in a constitutional manner.").

Our conclusion finds support in the Supreme Court's decision in Penry v. Lynaugh, 492 U.S. 302 (1989). In Penry, the Court considered a challenge to the Texas death penalty scheme, which limited the jury's consideration of the appropriate sentence during a capital trial to resolving

three "special issues." Id. at 311-12. The precise question before the Court was whether the defendant's sentence was unconstitutional "because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them." Id. at 313. Despite Teague, the Court reversed the death sentence, finding that the jury instructions and special issues structure did not adequately allow the jury to consider the defendant's mitigating evidence of mental retardation and an abused childhood. The Court stated that Lockett and Eddings, along with Jurek v. Texas, 428 U.S. 262 (1976), "dictated" the rule that "Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to th[e] mitigating evidence in determining whether the death penalty should be imposed." Penry, 492 U.S. at 318-19; see also Graham, 506 U.S. at 475 (indicating that the Lockett/ Eddings line of cases prohibit situations in which "relevant mitigating evidence [is] placed beyond the effective reach of the sentencer," and require that the jury must have a"reliable means of giving mitigating effect to" the mitigating evidence);12 Saffle, 494 U.S. at 491 (same).

In arguing for the nonretroactivity of Mills, the Commonwealth invokes two other Supreme Court decisions handed down after Mills. First, the Commonwealth relies on the dissenting opinion and one of the concurring opinions in McKoy v. North Carolina, 494 U.S. 433 (1990), to argue that reasonable minds could have disagreed on the

---

12. Unlike our concurring colleague, we do not view Graham v. Collins as adding anything of significance to the legal landscape. In Graham, the Supreme Court decided that, unlike Penry-- in which the Court held that the "special issues" structure did not give the jury a genuine opportunity for consideration of diminished capacity attributes such as mental retardation and an abused childhood -- the"special issues" structure did place certain mitigating evidence such as youth, family background and positive character traits within the sentencer's "effective reach." Graham, 506 U.S. at 475. Thus, a result in Graham's favor was not dictated by Penry and the Penry rule could not be given retroactive effect.

outcome in Mills. See also Caspari, 510 U.S. at 395 (noting that conflicting holdings of state and federal courts

indicates disagreement among reasonable minds); Sawyer v Smith, 497 U.S. 227, 236-37 (1990) (noting that the fact that three justices dissented in a prior case casts doubt on the argument that the holding in that case was compelled by prior precedent); Miller v. Lockhart, 65 F.3d 676, 686 (8th Cir. 1995) (citing opinions in McKoy). In McKoy, the Supreme Court affirmed Mills unconditionally and applied it to North Carolina's sentencing scheme, holding that the unanimity scheme there, precisely like the one in Mills, unconstitutionally precluded jurors from giving effect to evidence they might believe called for a sentence less than death. McKoy, 494 U.S. at 439-440. In the dissenting opinion and one of the concurring opinions, however, four justices in McKoy expressed some level of disagreement with the proposition that Mills was merely an application of the Lockett/Eddings rule. See id. at 452-457 (Kennedy, J., concurring in the judgment); id. at 457-471 (Scalia, J., dissenting). But see id. at 445-452 (Blackmun, J., concurring) (stating that in Mills "[t]he Court concluded that a rule mandating unanimous agreement before any juror could consider a particular mitigating factor was forbidden by [its] decisions in Lockett and Eddings" (citations omitted)). Despite the Commonwealth's suggestion otherwise, we are unconvinced that McKoy evidences anything but the correctness of our conclusion. The concurring and dissenting opinions in McKoy are not controlling authority, and our opinion today is in accord with the Court's majority opinions in both Mills  and McKoy, each of which independently makes clear that Mills was premised on a straight-forward application of settled constitutional precedent.13

---

13. Moreover, to the extent the Commonwealth relies on the McKoy minority's view that Mills was not actually decided on Lockett/Eddings grounds, we are unpersuaded that their argument is particularly relevant. Asking whether Mills is retroactive in this case is shorthand for asking whether the rule Banks seeks to have applied on habeas -- that the Constitution prohibits unanimity instructions that preclude jurors from giving proper consideration to proffered mitigating evidence -- was a new rule under Teague given the date his conviction became final. It is for similar reasons that, as we discuss below, our decision here is not

Secondly, the Commonwealth places great reliance on the Supreme Court's reasoning in Saffle v. Parks, 494 U.S. 484 (1990). In Saffle, the Supreme Court upheld a jury instruction that required the jury to "avoid any influence of sympathy" in sentencing, finding that the rule sought by Saffle, which was grounded in the principles established in Lockett and Eddings, was a new rule under Teague. Id. at 487. According to the Court, "Lockett and Eddings [did] not speak directly, if at all, to the issue presented" in Saffle, "whether the State may instruct the sentencer to render its decision on the evidence without sympathy." Id. at 490. In so concluding, the Court noted a distinction between rules relating "to what mitigating evidence the jury must be permitted to consider in making its sentencing decision,"

and those relating "to how it must consider the mitigating evidence." Id. (emphasis in original)."There is a simple and logical difference," the Court stated, "between rules that govern what factors the jury must be permitted to consider in making its sentencing decision and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision." Id. at 490. An anti-sympathy instruction does not preclude the jury from considering any mitigating evidence; it merely instructs them to consider that evidence without recourse to sympathy. See id. at 493 ("The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice."). Accordingly, the Court concluded that Lockett and Eddings do not prohibit such an anti-sympathy instruction. Id. at 490-94; see also Brown, 479 U.S. at 543 (affirming constitutionality of an anti-sympathy instruction).

---

formally inconsistent with, for instance, the Eighth Circuit's decision in Miller v. Lockhart, 65 F.3d 676 (8th Cir. 1995), that Mills was a new rule. Our conclusion that Mills may be retroactively applied on habeas is essentially an acknowledgment that what Banks seeks (and what Mills sought) is a clear application of the Lockett /Eddings rule, a constitutional principle well settled prior to his conviction becoming final. Thus, it could be argued that it is essentially irrelevant whether or not the rule under inquiry was actually decided in Mills.

26

The Commonwealth, as well as our concurring colleague, seizes on Saffle's "what" versus "how" distinction as supporting its view that Mills was a new rule; in effect, it argues that jury unanimity requirements made unconstitutional by Mills are nothing but a rule regarding how the jury must consider mitigating evidence, i.e., the jury must consider it unanimously. While perhaps viscerally appealing, upon reflection this linguistic shorthand does not withstand scrutiny. Indeed, we believe that, if anything, Saffle supports the conclusion that Mills did not announce a new rule. As discussed above, the harm identified in Mills by the Supreme Court-- as well as the dissenting opinion in the Maryland Court of Appeals-- was the potential that jurors were precluded from considering any and all mitigating evidence. See Mills, 486 U.S. at 375. Quite unlike the anti-sympathy instruction considered in Saffle, Mills does concern the precise harm addressed by the Court in Lockett and Eddings: Its focus was on what -- i.e., any and all -- evidence jurors could consider. Although "unanimously" is clearly an adverb, the meaning of the term "unanimously" as used here does not actually relate to "how" the jury is to view the evidence (as does sympathy). Rather, here unanimity presents a barrier, potentially preventing jurors from considering any and all mitigating evidence. To the extent that Saffle suggests that such rules are clearly prohibited by Lockett and Eddings, it lends support to our conclusion here. See Saffle, 494 US. at 491 (stating that preventing a jury from "considering, weighing,

and giving effect to all of the mitigating evidence . . . . come[s] under the rule of Lockett and Eddings").

Finally, we note that our conclusion finds additional support in a recent ruling by the Court of Appeals for the Sixth Circuit. In Gall v. Parker, 231 F.3d 265 (6th Cir. 2001), the Sixth Circuit held that application of Mills on habeas was not prohibited by Teague, both because Mills did not announce a new rule and because Mills falls within the second of Teague's exceptions to nonretroactivity. With regard to the former conclusion, which is more relevant here, the Sixth Circuit found that Mills was "dictated by the Lockett rule," and emphasized the language in Mills quoted above, in which the Supreme Court made "clear[that] it did nothing more than apply Lockett to a new factual situation."

27

Id. at 323. The Sixth Circuit also noted the Supreme Court's citation in Mills to Andres v. United States, 333 U.S. 740 (1948), which the court characterized as "a half-century old death penalty reversal" in which "the Court granted a new trial after finding fault in instructions that 'probab[ly]' induced a 'reasonable' juror to conclude that unanimity was needed to 'qualify' a verdict of guilty in order to preclude a death sentence." Gall, 231 F.3d at 323 (quoting Andres, 333 U.S. at 752). "Given Lockett, Andres, and the Court's clear language in Mills," the Sixth Circuit concluded that Mills did not impose a new constitutional obligation. Gall, 231 F.3d at 323.14

It is worth emphasizing here that Banks's case is far stronger than the one presented to the Sixth Circuit in Gall. Whereas Gall's conviction became final in 1981, limiting the legal landscape to primarily the plurality opinion in Lockett, Banks' conviction was not final until late in 1987, only months before Mills and after the Supreme Court's decisions in Eddings, Skipper, and Hitchcock, in all of which a clear majority of the Court applied the Lockett rule and reversed a sentence of death.

In contrast to the Sixth Circuit's decision in Gall, two Courts of Appeals have held that Teague bars the application of Mills on habeas. In Miller v. Lockhart, 65 F.3d 676 (8th Cir. 1995), the Eighth Circuit Court of Appeals held that Mills announced a new rule, but did so in a case

_____

14. Similarly, in an opinion we have previously referred to as "brief but thoughtful," Frey v. Fulcomer, 132 F.3d 916, 920 n.4 (3d Cir. 1997), the District of Delaware concluded in 1993 that the "requirement that juries in capital cases be permitted to consider all mitigating factors and aspects of a defendant's character and to give effect to that evidence was firmly established" in Lockett and Eddings. Deshields v. Snyder, 829 F. Supp. 676, 688 (D. Del. 1993) (quoting Byrd v. Delo, 733 F. Supp. 1334 (E.D. Mo. 1990). Accordingly, the court found that Mills was "nothing more than a mere extension of then existing precedent to a new factual scenario." Id.; see also, e.g., Hopkinson v. Shillinger, 781 F. Supp. 737, 742 (D. Wy. 1991) ("The Eighth Amendment [under Lockett and Eddings]

prohibits barriers to consideration of mitigating evidence whether they result from evidentiary rulings, statute, or jury instructions. Thus, Mills and McKoy are simply different factual applications of that established principle and are applicable [on habeas].").

28

in which, like Gall, only Lockett had been decided prior to the defendant's conviction becoming final. Id. at 685. The question of whether Mills was dictated by the plurality opinion in Lockett alone may be a close one-- as demonstrated by the contradictory opinions of the Sixth and Eighth Circuits -- but the answer to the question before us is clear. When considering Lockett in conjunction with Eddings, in which a majority of the Court adopted the rule announced by the Lockett plurality, the result in Mills was obvious, especially given the Court's continued reliance on and application of the Lockett rule, prior to Mills, in cases such as Skipper and Hitchcock.

The Court of Appeals for the Fifth Circuit has also repeatedly stated that Mills announced a new rule under Teague. See Woods v. Johnson, 75 F.3d 1017, 1036 (5th Cir. 1996); Nethery v. Collins, 993 F.2d 1154, 1161-62 (5th Cir. 1993); Wilcher v. Hargett, 978 F.2d 872, 877-78 (5th Cir. 1992); Cordova v. Collins, 953 F.2d 167, 173 (5th Cir. 1992). However, as we previously noted in Banks I, the court has not analyzed or explained its conclusions. Banks I, 271 F.3d at 542 n.16. Accordingly, we find little in the Fifth Circuit's decisions to persuade us that our application of Mills is prohibited by Teague. 15

IV.

Our previous ruling in this case was reversed by the Supreme Court only insofar as we held it unnecessary to decide whether Mills had retroactive application. Because we now hold that our application of Mills on habeas review of Banks's sentence was not prohibited by Teague , we do not disturb the remainder of our previous opinion, including its discussion and holding with regard to the merits of Banks's Mills claim. We merely augment that opinion by essentially replacing its discussion of the Teague

---

15. We also note that in McDougall v. Dixon , 921 F.2d 518, 539 (4th Cir. 1990), the Court of Appeals for the Fourth Circuit indicated in dicta that Mills and McKoy were new rules under Teague. In Williams v. Dixon, 961 F.2d 448, 453 n.3 (4th Cir. 1992), however, the court found it unnecessary to consider whether Mills and McKoy were in fact new rules because it held that they fell within the second Teague exception.

29

issue with the analysis here. Accordingly, our judgment requiring a new penalty phase for Banks will remain unchanged.

SLOVITER, Circuit Judge, concurring.

I continue to adhere to the judgment of the court instructing the District Court to grant a provisional writ of habeas corpus directed to the petitioner's penalty phase. However, my response to the issue on which the United States Supreme Court remanded this case to us differs from that of the majority.

I.

In its per curiam opinion remanding this case, Horn v. Banks, 536 U.S. 266, 122 S. Ct. 2147 (2002), the Supreme Court directed that we perform an analysis under Teague v. Lane, 489 U.S. 288 (1989), as to the retroactive application of Mills v. Maryland, 486 U.S. 367 (1988). The Court believed that we had contravened Caspari v. Bohlen, 510 U.S. 383 (1994), "in which [the Court] held that federal courts must address the Teague question when it is properly argued by the government." Horn, 536 U.S. at ___, 122 S. Ct. at 2148. We must therefore, as a threshold issue, address Teague which, although a plurality opinion, has since been accepted by the Court as setting forth the standard for retroactivity analysis.

The petitioner in Teague sought to challenge the composition of his jury, as the prosecutor had used all 10 of his peremptory challenges to exclude blacks. Teague had argued throughout, without success, that the jury was not a fair cross section. His habeas petition in the Supreme Court sought the benefit of its decision in Batson v. Kentucky, 476 U.S. 79 (1986) (holding that under the Equal Protection Clause the prosecutor had the burden to give a race-neutral explanation for its use of peremptory challenges to exclude black persons from the petit jury). The Court had previously held in Allen v. Hardy , 478 U.S. 255 (1986) (per curiam), that Batson, which overruled a portion of Swain v. Alabama, 380 U.S. 202 (1965), could not be applied to a case on collateral review because Batson constituted an " 'explicit and substantial break with prior precedent.' " Teague at 295 (quoting Allen, 478 U.S. at 258). Teague's second contention in the Supreme Court, that he established a violation of the Equal Protection Clause under

Swain, was procedurally barred because Teague never presented that claim to the state courts.

Thus, the Court turned to Teague's fair cross section claim, where he relied on the holding in Taylor v. Louisiana, 419 U.S. 522 (1975), that the Sixth Amendment required that the jury venire be drawn from a fair cross section of the community. Teague sought to apply the holding in Taylor to the composition of the petit jury. In holding that acceptance of Teague's claim would constitute a new rule

that it would not apply retroactively to cases on collateral review, the Supreme Court reformulated the standard previously enunciated in Linkletter v. Walker , 381 U.S. 618 (1965), and enunciated the principle that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. The Court explained that "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." Id. at 309.

As to the definition of a "new rule," the Supreme Court explained in Teague that "[i]n general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." Id. at 301. It continued, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." Id. The Court recognized two exceptions to its rule of non-retroactivity, both derived from Justice Harlan's opinion in Mackey v. United States, 401 U.S. 667, 675 (1971) (opinion concurring in judgments in part and dissenting in part). The first is for a rule that places " 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' " Id. at 311 (quoting Mackey, 401 U.S. at 692). The second exception is for "watershed rules of criminal procedure." Id.

In the Supreme Court's opinion in Caspari, the Court elaborated on the responsibility of a federal court faced with a habeas petition seeking relief based on a rule announced after the defendant's conviction became final. Caspari, 510

32

U.S. at 390. The court must survey "the legal landscape" as it existed on the date the defendant's conviction became final and then determine if "a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." Id. (citations omitted). If the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the non-retroactivity principle. Id.

The rule on which Banks relies is that enunciated in Mills. In Mills, the Supreme Court vacated a death sentence where the sentencing court's instruction left a substantial probability that the jurors may have believed they had to be unanimous on the existence of a particular mitigating factor before it could be weighed against an aggravating factor in determining whether the death sentence should be imposed. 486 U.S. at 375-76, 384.

Banks contends that in 1987, at the conclusion of his direct review in state court, the Supreme Court had decided

numerous cases creating the framework upon which Mills was predicated, and that therefore Mills should not be regarded as a new rule for purposes of non-retroactivity under Teague. Banks argues that by the time his sentences became final as defined under Teague and Caspari, the Supreme Court had decided ten cases before Mills that "embody the Eighth Amendment prohibition against a state mandated process that creates a barrier to juror consideration of indispensable evidence of the character and record of an offender in a death penalty proceeding." Appellant's Supp. Br. at 3. He counts among those cases Furman v. Georgia, 408 U.S. 238 (1972) (invalidating procedures that created a substantial risk that death penalty would be imposed in an arbitrary and capricious manner), and, surprisingly, the three cases after Furman that sustained the imposition of death sentences, Jurek v. Texas, 428 U.S. 262 (1976); Gregg v. Georgia , 428 U.S. 153 (1976); and Proffitt v. Florida, 428 U.S. 242 (1976). Banks' argument is that although the death sentencing schemes were held constitutional in all three cases, the respective schemes allowed the sentencer to consider the defendant's evidence of mitigating circumstances.

33

Banks states that in Woodson v. North Carolina , 428 U.S. 280 (1976), where sentences of death were overturned because the jurors were prevented from considering all mitigating circumstances, the Supreme Court "recognized the constitutional requirement of an 'individualized sentencing' in capital cases." Appellant's Supp. Br. at 4. The Woodson plurality gave three reasons for its holding: the state statute at issue imposed a mandatory death sentence for certain offenses; it provided no standards to guide the jury in determining which offenders should be sentenced to death; and it did not allow the sentencer to consider the character and record of an offender and the circumstances of the offense as part of the process of inflicting the death penalty. 428 U.S. at 301-04.

Banks next notes the decision in Roberts v. Louisiana, 428 U.S. 325, 333-34 (1976), decided the same day as Gregg, Proffitt, Jurek, and Woodson, which also struck down the death penalty statute because, like that in Woodson, it failed to provide for any meaningful opportunity for consideration of the character and record of the defendant or the circumstances of the crime. Banks then emphasizes the decision in Lockett v. Ohio , 438 U.S. 586, 608 (1978), where the Supreme Court found unconstitutional a state statute that allowed consideration of only a limited number of mitigating factors. Continuing along this line, Banks lists Eddings v. Oklahoma , 455 U.S. 104, 113-15 (1982), where the Supreme Court ruled that a sentencing judge improperly decided, as a matter of law, that he could not consider evidence of a defendant's troubled family history and emotional disturbance as mitigating evidence.

He next references Skipper v. South Carolina, 476 U.S. 1,

4 (1986), holding that the trial judge improperly ruled that the jury could not consider a defendant's good conduct in prison as mitigating evidence, California v. Brown, 479 U.S. 538, 541 (1987), upholding the sentence of death by interpreting the jury instruction to be consistent with the Eddings line of cases, and the opinion in Hitchcock v. Dugger, 481 U.S. 393, 398-99 (1987), decided shortly thereafter, where the Supreme Court held that a new sentencing hearing was required because the advisory jury

and judge should have considered evidence of non-statutory mitigating circumstances.

Banks argues that this line of cases, embodying the rule that a jury in a capital case must be permitted to consider all mitigating factors, compelled the holding in Mills that "prohibited a state from requiring a jury to be unanimous before they could find the existence of a particular mitigating circumstance." Appellant's Supp. Br. at 9. He continues, "The Woodson-Lockett-Eddings-Dugger lines of cases dictate such a result." Id. He relies on the following language in Mills:

> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, Lockett v. Ohio, supra; [citation omitted]; by the sentencing court, Eddings v. Oklahoma, supra, or by an evidentiary ruling, Skipper v. South Carolina, supra . The same must be true with respect to a single juror's holdout vote against finding the presence of a mitigating circumstance. Whatever the cause . . . the conclusion would necessarily be the same: 'Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of Lockett, it is our duty to remand this case for resentencing.' Eddings v. Oklahoma, 455 U.S., at 117, n. (O'Connor, J., concurring).

Mills, 486 U.S. at 375, quoted in Appellant's Supp. Br. at 9.

Banks finds further support in Penry v. Lynaugh , 492 U.S. 302 (1989),1 the only case in the series to consider the retroactivity issue. The petitioner in Penry claimed, inter alia, that he was sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration the mitigating evidence of his mental retardation and abused background. Under the state sentencing scheme, if the jury answered in

---

1. The holding in Penry rejecting the claim that the Eighth Amendment prohibits the execution of a retarded person was abrogated in Atkins v. Virginia, 122 S. Ct. 2242 (2002).

the affirmative all of the three "special issues" questions required by the statute, the sentencing court was required to impose the death sentence.2 The same statute had been challenged previously in Jurek where the Court rejected the challenge, holding that the state court would interpret the second question to allow the jury to consider mitigating evidence. The Penry petitioner argued that the jury would not have been aware that the evidence on which he relied, mental retardation and childhood abuse, could be considered as mitigating circumstances unless it was so instructed by the trial court. The Supreme Court agreed that Penry had a right to resentencing, and remanded so that a new sentencing hearing could be held with instructions informing the jury that it could give effect to the mitigating evidence of Penry's mental retardation and abused background in considering whether to impose a death sentence. Id. at 328.

Before reaching its decision, the Court considered whether granting Penry the relief he sought would create a "new rule" under Teague. The Court concluded that it was not applying a new rule under Teague because, at the time the petitioner's conviction became final, it had already been decided in Lockett and Eddings that a state could not prevent the sentencer from considering and giving effect to mitigating evidence from the defendant's background, character or circumstances of the offense. Id. at 318.

The Commonwealth reads the pre-Mills cases differently than does Banks, leading it to conclude that Mills announced a new rule. It reads the decisions on which Banks relies, Lockett, Eddings, Skipper, and Hitchcock, which represent where the law stood at the time Banks' conviction became final, as reversing the death sentences imposed because the sentencer "had been entirely precluded from considering a category of appropriate

_____

2. The special issues were (1) whether the defendant's conduct was deliberate and with the reasonable expectation that death would result; (2) whether there is a probability that the defendant would commit criminal acts of violence that would be a continuing threat to society; and (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. Penry, 392 U.S. at 310.

36

mitigating evidence." Appellees' Supp. Br. at 4. It points out that in contrast to those cases, the Mills jury could hear and consider any evidence of mitigation that the defendant presented. The Commonwealth states that the Mills rule (which declared unconstitutional the requirement that jurors agree unanimously on a mitigating factor to be used in the weighing step) went beyond the previously enunciated principle that the jury must be allowed to consider mitigating evidence. The Commonwealth argues

that Mills enunciated a new rule when it rejected, for the first time, the requirement of unanimity on a particular mitigating factor.

The Commonwealth also contends that the result in Mills, a 5-4 decision, was not a foregone conclusion and "marked a significant leap from prior precedent." Appellees' Supp. Br. at 4. It notes that four present Supreme Court justices dispute that the Mills decision was " 'controlled or governed' by Lockett and Eddings, let alone dictated by those earlier decisions." Id. at 9, citing McKoy v. North Carolina, 494 U.S. 433, 452-56 (1990) (Kennedy, J., concurring opinion); id. at 471 (Scalia, J., dissenting opinion, with Rehnquist, C.J., and O'Connor, J.).

The courts of appeals that have considered whether Mills announced a new rule have divided on their view. In Gall v. Parker, 231 F.3d 265, 322 (6th Cir. 2000), cert. denied, 533 U.S. 941 (2001), the Court of Appeals for the Sixth Circuit held that the rule in Mills was not new. The court explained that Lockett was firmly in place in 1981 when petitioner's conviction became final, and stated that a state court facing the petitioner's claim at that time would have felt compelled to apply Lockett as Mills ultimately did in 1988. Id. at 323. It further stated that Mills did not break new ground or impose a new obligation on the states or federal government. Id. See also DeShields v. Snyder, 829 F. Supp. 676, 687-88 (D.Del. 1993) (concluding Mills did not announce a new rule for Teague purposes).

Unlike the Sixth Circuit, the Court of Appeals for the Eighth Circuit concluded that Mills announced a new rule that does not apply retroactively on collateral review. In Miller v. Lockhart, 65 F.3d 676, 685-86 (8th Cir. 1995), the court held that the result in Mills was not dictated by prior

37

cases and while Lockett may inform, control or govern Mills, Lockett did not compel the further holding that a unanimity requirement for mitigating circumstances is unconstitutional. The Court of Appeals for the Fifth Circuit reached the same conclusion in Cordova v. Collins, 953 F.2d 167, 173 (5th Cir. 1992), where the court stated that it was precluded by Teague from applying Mills retroactively.

I previously expressed my view that under the Teague analysis the Supreme Court would likely view Mills as announcing a new rule, and that it would not apply retroactively. See Zettlemoyer v. Fulcomer, 923 F.2d 284, 316-17 n.3 (3d Cir. 1991) (Sloviter, J., dissenting). Although I find the result reached by the majority attractive, and I agree that Mills followed logically from earlier cases, I regretfully cannot join the majority's view that Mills may be applied retroactively to Banks' case because Mills did not create a new rule for purposes of a Teague analysis.

My view is informed in large part by several decisions of the Supreme Court which, after analyzing Teague , characterized the rules at issue in those cases as new ones. In Saffle v. Parks, 494 U.S. 484 (1990), Parks, a habeas petitioner, claimed that a penalty phase jury instruction telling the jury to avoid any influence of sympathy violated his Eighth Amendment rights. Parks argued that jurors must be allowed to base their sentencing decision upon sympathy after hearing the mitigating evidence.

In concluding that the principle Parks advanced created a new rule under Teague, the Supreme Court held that Lockett and Eddings did not dictate such a result. Id. at 490. The Court explained that although the decisions in Lockett and Eddings limit the ability of a state to define the factual bases upon which the capital sentencing decision must be made, they do not speak to whether the state may instruct the sentencer to render its decision on the evidence without sympathy. Id. As the Saffle Court explained, "[t]here is a simple and logical difference between rules that govern what factors the jury must be permitted to consider in making its sentencing decision and rules that govern how the State may guide the jury in considering and

38

weighing those factors in reaching a decision." Id. Because it deemed the rule sought by Parks to be a new one, the Court did not consider the merits of Parks' proposed rule. The Commonwealth relies on the distinction made by the Supreme Court in Saffle between what mitigating evidence the jury must be allowed to consider as opposed to how it must consider the mitigating evidence. Appellees' Supp. Br. at 6.

Another application of the Teague new rule/existing rule distinction is found in Butler v. McKellar, 494 U.S. 407 (1990). In that case, a habeas petitioner sought the benefit of the holding in Arizona v. Roberson, 486 U.S. 675 (1988), that the police may not initiate questioning after the accused invokes his right to counsel in the context of a separate investigation. Butler argued that Roberson should be applied to his case because it did not establish a new rule under Teague but merely followed the rule established in Edwards v. Arizona, 451 U.S. 477 (1981), where the Court held the police must refrain from further questioning after the accused had invoked his right to counsel.

Butler noted that the Supreme Court had stated in Roberson that the case was directly controlled by Edwards. Nonetheless, the Court in Butler decided, in an approach consistent with that it took in Saffle, that Roberson announced a new rule because its result was not"dictated" by the Edwards precedent. 494 U.S. at 409. The Court explained that its outcome in Roberson was susceptible to debate among reasonable minds, as evidenced by the differing positions taken by judges of other courts. Id. at 415.

Thereafter, in Graham v. Collins, 506 U.S. 461 (1993), the Court once again focused on the meaning of the statement in Teague that a new rule is one that was not "dictated by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301. Graham, the habeas petitioner, contended that the sentencing jury was unable to give effect to mitigating evidence of his age, background and character within the confines of the three special issues questions in the same Texas sentencing statute at issue in Penry. Although the Court in Penry had required instructions that the jury should consider mental

retardation and childhood abuse as mitigating evidence, in Graham the Court held that the relief Graham sought, instructions that the jury consider age, background and character as mitigating, would require announcement of a new rule. Id. at 476-77. It stated that "the determinative question [under Teague] is whether reasonable jurists reading the case law that existed in 1984 could have concluded that Graham's sentencing was not constitutionally infirm." Id. Because it could not say, even with the benefit of the Court's decision in Penry, that reasonable jurists would be of one mind on Graham's claim, the ruling sought would be a new rule. The Court noted the limited issue before it in Penry and stated that it did not read Penry "as effecting a sea change in [the] Court's view of the constitutionality of the former Texas death penalty statute; it does not broadly suggest the invalidity of the special issues framework." Id. at 474. Thus, it rejected Graham's reliance on Penry. The language used in the Graham opinion reiterates the need to show the result was "commanded" by the earlier cases if it is not to be viewed as a new rule. See id. at 475; see also Lambrix v. Singletary, 520 U.S. 518, 528 n.3 (1997) (finding Espinosa v. Florida, 505 U.S. 1079 (1992) (per curiam), announced a new rule that was not dictated by precedent where earlier cases did not compel the outcome because they did not answer the definitive question before the Court).

Although Mills can be viewed as establishing an incremental step in the series of cases beginning with Furman, I believe it is not commanded by the earlier cases in the sense the Court approached that issue in Saffle, Butler and Graham. Hence, I conclude that Mills established a new rule within the Teague inquiry that does not apply retroactively, unless it falls within one of the two exceptions to Teague.

Those exceptions are narrow. The first exception, that for new rules that place " 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,' " Caspari , 510 U.S. at 396 (quoting Teague, 489 U.S. at 307), is plainly not applicable. The manner in which the jury must consider mitigating

evidence does not relate to the "primary, private, individual conduct" underlying the offense at issue.

Banks contends that if Mills created a new rule, the second exception, that for " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," id. (quoting Saffle, 494 U.S. at 495), applies but I cannot agree. The exception is meant to apply only to a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. Graham, 506 U.S. at 478 (citations omitted). The Saffle Court gave as an example of the type of rule falling within the second exception the rule enunciated in Gideon v. Wainwright, 372 U.S. 335 (1963), that a defendant has the right to be represented by counsel in all criminal trials for serious offenses. See 494 U.S. at 495. In Teague, itself, the Court gave as illustrations for the second exception the classic grounds for the issuance of a writ of habeas corpus -- that the proceeding was dominated by mob violence, that the prosecutor knowingly used perjured testimony or that a conviction was based upon a confession obtained by brutal methods. See Teague, 489 U.S. at 313 (citations omitted).

No Supreme Court case since Teague has held the second exception applicable. For example, in Sawyer v. Smith, 497 U.S. 227, 245 (1990), the Supreme Court found that the rule in Caldwell v. Mississippi, 472 U.S. 320 (1985), which held that the Eighth Amendment prohibits the imposition of a death sentence by a sentencer that has been led to the false belief that the responsibility for determining the appropriateness of the defendant's capital sentence rests elsewhere, does not satisfy the exception. The Court stated that the second exception would apply only to a new rule that, in addition to improving the accuracy of trial, " 'alter[s] our understanding of the bedrock procedural elements' " essential to the fairness of a proceeding. 497 U.S. at 242 (citing Teague, 489 U.S. at 311 (citation omitted)). It further stated that it is" 'unlikely that many such components of basic due process have yet to emerge.' " Id. at 243 (quoting Teague, 489 U.S. at 313).

Although I believe that the rule in Mills is aimed at improving the reliability of capital sentencing, in light of the

41

Supreme Court's decisions in Saffle, Butler, and Graham I cannot conclude that Mills alters our understanding of the bedrock procedural elements essential to the fairness of a proceeding. Therefore, I reject Banks' argument that Mills falls within the second Teague exception.

II.

Notwithstanding my view that Mills created a new rule under Teague that does not fall within either of the Teague

exceptions, I believe that Teague does not apply in the special circumstances under which the Pennsylvania Supreme Court reviewed Banks' post-conviction petition. I note initially that in its opinion remanding to this court, the Supreme Court focused only on our failure to analyze the Teague issue and did not reach the merits of our holding in Banks I "that the Pennsylvania Supreme Court ruling involved an unreasonable application of Mills ." Banks v. Horn, 271 F.3d 527, 545 (3d Cir. 2001). There would be no basis therefore to assume that the Court rejected that holding. But in light of my conclusion that Mills established a new rule, it is incumbent on me to explain why I believe we are free to apply Mills retroactively to Banks' case. The explanation lies in Pennsylvania's unique relaxed waiver rule in effect at the time of Banks' state post-conviction proceedings.

Banks' 1983 conviction of first degree murder and related crimes was affirmed by the Pennsylvania Supreme Court on direct appeal in 1987. Commonwealth v. Banks, 521 A.2d 1 (Pa.), cert. denied, 484 U.S. 873 (1987). When Banks appealed the trial court's 1993 denial of his petition for post-conviction relief to the Pennsylvania Supreme Court, he asserted, among other claims, that the jury instructions, jury poll and verdict slip violated Mills (decided after Banks' direct appeal was completed) by suggesting that the jury's findings as to mitigating circumstances must be unanimous. The Commonwealth argued that all of the issues raised in the post-conviction petition were waived because Banks failed to raise them on direct appeal. The Pennsylvania Supreme Court agreed that some of the issues could have been raised on direct appeal and thus could be deemed waived under the Post Conviction Relief

42

Act, 42 Pa. Cons. Stat. SS 9541-46 ("PCRA"), but stated that it would "address all of Appellant's claims since the trial court addressed all of those claims and since it is this Court's practice to address all issues arising in a death penalty case irrespective of a finding of waiver." Commonwealth v. Banks, 656 A.2d 467, 470 n.7 (Pa. 1995). The first issue it addressed was Banks' claim that the jury instruction, jury poll and the verdict slip violated the Supreme Court's mandate in Mills.

The Pennsylvania Supreme Court considered the Mills claim on the merits. This was the first time it did so. It reviewed the jury instruction and found that it had determined in another case that the instruction, "which mirrors the language found in the death penalty statute of [the Pennsylvania] Sentencing Code," did not violate Mills. Id. at 470. It similarly held that the form of the verdict slip did not violate Mills, and that the answers provided by the jurors during the poll did not suggest that they believed unanimity was required in finding mitigating circumstances. Id.

A state conviction and sentence become final for

purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied. Caspari, 510 U.S. at 390; Kapral v. United States, 166 F.3d 565, 572 (3d Cir. 1999). Although Banks' direct appeal technically had been exhausted, the Pennsylvania Supreme Court treated his petition for collateral relief like a direct appeal by considering his Mills claim on the merits. Because the Pennsylvania Supreme Court applied the relaxed waiver doctrine, Banks' conviction was not final within the meaning of Teague until the Pennsylvania Supreme Court affirmed the denial of his PCRA petition and his petition for a writ of certiorari was denied.

The Teague rule stems in large part from the desire to accord comity to decisions of the state courts, which, in their review of the case, did not have the opportunity to analyze the effect of a subsequent Supreme Court decision. The rationale for the comity principle has been articulated most forcefully in the cases dealing with the exhaustion

doctrine. More than a century ago, in Ex parte Royall, 117 U.S. 241, 251 (1886), the Supreme Court wrote that as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act.

After Congress' 1948 codification of the exhaustion doctrine at 28 U.S.C. S 2254, the Supreme Court in Rose v. Lundy, 455 U.S. 509 (1982), analyzed the policies underlying the statute as follows:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. [citation omitted]. Under our federal system, the federal and state 'courts [are] equally bound to guard and protect rights secured by the Constitution.' [citation omitted]. Because 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' federal courts apply the doctrine of comity, which 'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.' [citations omitted].

Id. at 518 (emphasis added).

More recently, in O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999), where the Court held that a state prisoner must present his claims to a state supreme court in a petition for discretionary review in order to satisfy the

exhaustion requirement, the Court explained that the
exhaustion doctrine is designed to give the state courts a
full and fair opportunity to resolve federal constitutional
claims before those claims are presented to the federal
courts. It further stated, citing Rose,

> State courts, like federal courts, are obliged to enforce
> federal law. Comity thus dictates that when a prisoner
> alleges that his continued confinement for a state court
> conviction violates federal law, the state courts should

> have the first opportunity to review this claim and
> provide any necessary relief. [citations omitted]. This
> rule of comity reduces friction between the state and
> federal court systems by avoiding the 'unseem[liness]'
> of a federal district court's overturning a state court
> conviction without the state courts having had an
> opportunity to correct the constitutional violation in
> the first instance. [citations omitted].

Id. at 844-45. See also Duncan v. Walker , 533 U.S. 167,
178-79 (2001) (recognizing principle of comity set forth in
O'Sullivan and Rose). We also have recognized the same
rationale. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir.
2000), cert. denied, 532 U.S. 980 (2001).

In this case, because of the application of Pennsylvania's
unique relaxed waiver doctrine in capital cases, the
Pennsylvania Supreme Court not only had the first
opportunity to review Banks' jury instructions, verdict slip,
and jury poll in light of Mills, but exercised that
opportunity. It thus treated that claim as on direct appeal
and there is no reason why, even though Mills  announced
a new rule, the Pennsylvania Supreme Court's resolution of
that issue should not be cognizable on federal habeas
review. I adhere to the majority's judgment in our decision
filed October 31, 2001 that the Pennsylvania Supreme
Court's ruling denying Banks' claim under Mills  was
unreasonable. Therefore, I concur in its judgment today.3

---

3. The unique circumstances presented by this case are unlikely to recur
because the Pennsylvania Supreme Court now strictly construes the
state's Post Conviction Relief Act. In Commonwealth v. Albrecht, 720 A.2d
693, 700 (Pa. 1998), the Pennsylvania Supreme Court abandoned its
application of a relaxed waiver doctrine in capital cases in PCRA appeals
because the "ever-widening application of the doctrine has, in effect,
virtually eliminated any semblance of finality in capital cases, and
frustrated the efficient use of the resources of the court." Since Albrecht,
the Pennsylvania Supreme Court has ruled that claims of trial court
error, like the Mills claim in the present case, are not reviewable on
collateral review. See, e.g., Commonwealth v. Wallace, 724 A.2d 916, 921
n.5 (Pa. 1999) (finding claims of trial court error that could have been
raised on direct review waived). It has also rejected the argument that

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

the abrogation of the relaxed waiver rule should not apply retroactively to PCRA petitions filed before Albrecht was issued. See Commonwealth v. Bracey, 795 A.2d 935, 941 (Pa. 2001) (because Albrecht merely clarified the court's practice of relaxing its waiver rules in death penalty cases, the defendant suffered no constitutional violation by its retroactive application).